# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
SOCORRO SUSAN CARO,
Defendant and Appellant.

S106274

Ventura County Superior Court
CR47813

June 13, 2019

Justice Cuéllar authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Kruger, and Groban concurred.

Justice Liu filed a concurring opinion.

PEOPLE v. CARO

S106274

Opinion of the Court by Cuéllar, J.

In April 2002, defendant Socorro Susan Caro was sentenced to death for killing three of her four children. This is her automatic appeal. We affirm the judgment below.

## I. BACKGROUND

Caro and her husband, Dr. Xavier Caro (Xavier[1]), had four children: Xavier (known as "Joey"), Michael, Christopher, and G.C. On November 22, 1999, Joey, Michael, and Christopher were shot to death in the family home in Camarillo, California. Joey was 11, Michael was 8, Christopher was 5, and G.C. was 1. The Ventura County District Attorney filed a felony complaint against Caro on December 17, 1999, and an information on April 24, 2000. Caro was charged with three counts of murder (Pen. Code, § 187, subd. (a))[2] while personally using a firearm (§ 12022.53, subd. (d)), and a multiple-murder special circumstance (§ 190.2, subd. (a)(3)). Caro pleaded not guilty, and not guilty by reason of insanity.

At trial, the prosecution presented the testimony of Caro's husband. Xavier met Caro in 1979 during her externship in his rheumatology medical practice. They began dating in 1980 and

---

[1] We refer to Caro's husband by his first name to avoid confusion.

[2] All subsequent unlabeled statutory references are to the Penal Code.

1

married in 1986.  At the time of the shootings, Caro's parents lived in the couple's nearby second home and Caro's mother, Juanita, would often stay over to help with the children.

Early on in their relationship, Caro began working as Xavier's office manager.  In August 1999, Xavier fired Caro because, according to Xavier, she had been providing more money than expected to her parents while allowing the medical office's rent to go unpaid.  Xavier had also been having an affair with someone who worked in his office.  Xavier and Caro had discussed divorce at various points in their relationship, and after firing Caro, Xavier consulted a divorce lawyer.  Xavier testified he did not actually want a divorce.  Indeed, Xavier thought their marriage had improved after Caro and he agreed in August 1999 to go to counseling, and Caro agreed to take Prozac.

On the night of the shootings, November 22, 1999, Xavier returned from work between 6:00 and 6:30 p.m.  Xavier had dinner with Caro, and they drank margaritas.  Joey made a negative comment about his parents' drinking.  Xavier and Caro argued:  Xavier wanted to discipline Joey, but Caro did not.  Later, after Xavier removed the television and videogame system from Joey's room as punishment, Xavier and Caro continued their argument.  Caro accused Xavier of not loving her, and not respecting her.  Xavier said he was leaving.  Caro grabbed him by the shoulders, slid to the floor, and held his ankles as he pulled away from her.  Juanita came up the stairs and yelled, "Get out, you brute."  Xavier entered the garage, got in his 1989 maroon Mercedes, and drove away.

Juanita's testimony about the end of the fight that evening was similar, though she testified that Xavier kicked Caro "on

2

the legs" when Caro was on the ground. Juanita told police that after Xavier left, Caro said, "Now, Mom. I have no money now. I don't know what I'm going to do," and "Mom, we're going to starve now." Caro also told Juanita that night, "Well, I guess I'm crazy like he says I am" and "Mom, he says I'm crazy." Around 9:00 p.m., Juanita left the house to return to her home. Caro seemed normal. Juanita returned a few minutes later because she forgot her glasses and left again soon after.

Xavier testified that he drove to his office in Northridge, which was 40 to 46 minutes away from the house. Caro called Xavier multiple times on his car phone and at the office. When Xavier answered the phone at the office, Caro was crying and agitated and asked Xavier to come home. Caro then calmly stated, "That's the thing I've always admired about you, X. You always know the difference between right and wrong." Phone records show that Xavier made an unanswered call home at 9:53 p.m. from the office. Xavier testified that he left the office around 10:30 p.m. to return home. As he left the building, Xavier saw a big white truck parked outside the gate, a truck that, according to the guard records, entered the hospital at 10:25 p.m. Time-stamped videotapes from security cameras at Xavier's work showed a vehicle similar to Xavier's car arriving at 9:24 p.m. and leaving at 10:36 p.m.

When Xavier returned home, he found Caro lying on her right side in a semifetal position on the floor of their master bedroom. Xavier noticed a bloodstained froth around her mouth and thought she had overdosed. Xavier called 911 from a phone in the bedroom at 11:21 p.m. He told the operator that Caro might have overdosed or slit her wrists. Xavier rolled Caro onto her back and noticed a .38-caliber revolver underneath Caro, and several expended shell casings. Xavier had previously

purchased the gun for Caro, along with a gun for himself, for self-defense. Xavier picked up the gun and saw a single shell casing in the five-round cylinder.

The 911 operator asked if there were any children in the house. Xavier went to Joey's bedroom and found him lying face up covered in blood. Xavier checked for a pulse but found none. He then entered Michael and Christopher's room and saw them lying together in the bottom bunk of the bunk bed. Their faces were ashen and neither boy was breathing. Xavier returned to the master bedroom and told the 911 operator that his children had been shot. Xavier kicked Caro and yelled at her.

The 911 operator asked how many children were in the home. Xavier went to G.C.'s crib, found G.C. unharmed, and told the 911 operator, "We've got one alive here." Xavier picked up G.C. and went to check the other children again. Joey and Christopher were not breathing, but Michael was taking deep gasping breaths. Xavier attempted to perform CPR on Michael, until a fragment of Michael's skull came off in his hands. Xavier ran out of the room and told the 911 operator that first responders needed to get there fast. He called Juanita on a second phone line at 11:26 p.m. and told her that Caro "shot the babies." Xavier went to the front door where he encountered two Ventura County Sheriff's deputies, who ordered him outside. Xavier had G.C. in his arms and was distraught.

When officers found Caro in the master bedroom, she was surrounded by several pools of blood, a pool of vomit, and expended shell casings. Caro was airlifted to a hospital. Meanwhile, back at the family's home, Juanita had arrived. In a conversation between Xavier and Juanita that an officer recorded, Xavier alternated between a calm and visibly upset

demeanor. He stated: "Why did she do this?"; "She killed my best friend. She killed my Joey"; and "She wasn't messing around. She shot them all in the head."

Xavier testified that he always kept the guns in a gun safe, and Caro did not have the combination. In 1994 or 1995, following an argument, Xavier came home to find Caro holding a gun at the top of the stairs in the house. Xavier grabbed Joey and left, but came back when Caro called and said she would leave the gun in plain view for Xavier to recover.

Caro underwent surgery on the night of the shootings for a gunshot to the head. Caro also had bruising on her right bicep, bruising on the inside of her thighs, and a fractured foot that was swollen and bruised. The forepart of the foot had broken away from the middle part of the foot and was repaired surgically a week later. Such an injury most commonly occurs by landing on a pointed foot so that the foot is twisted, which can happen when falling down stairs. The injury may also occur from a person falling on his or her foot with the person's own weight, or if someone else stands on the foot as the person falls.

The day after the shootings, Detective Cheryl Wade went to Caro's hospital room and recorded the entire two-and-a-half to three-hour visit. Wade asked Caro if she had taken a fall, and Caro said she was not sure and could not remember. Caro said at one point that she "might have fallen down the stairs," and that she was bruised by "wrestling with a boy." But she reiterated on multiple occasions that she did not remember how she had been hurt. A defense expert enhanced the audiotape and believed Caro said, "You have to ask the boys" rather than "wrestling with the boys."

Detective Wade told Caro that her boys had been hurt, that they had died, and that Caro was a suspect. Caro began crying and screaming. Caro asked what Xavier had said and asked where G.C. was located and whether he was okay. Detective Wade later brought Juanita into Caro's room and recorded Juanita's conversation with Caro. Caro said that "X is going to need somebody." Juanita asked, "Why did you do this?" Caro replied, "My babies. My babies. I'm sorry. I'm sorry."

Lisa VanEssen worked at Xavier's office. She testified that Caro had previously said she did not think Xavier loved her and was worried that Xavier would leave her and the boys with nothing. Around September 1999, VanEssen asked Caro how she was and Caro replied, "Not good. Sometimes I think it would just be better if I wasn't here." When VanEssen reminded Caro of her "four boys that need [her]," Caro replied, "What would it matter?"

Investigators found a gun safe in Caro and Xavier's master bedroom closet; the safe showed pry marks that could not be dated. The door to the gun safe could be opened without entering a combination. There were no testable fingerprints on the gun, but the gun was also stained, so it was unlikely the gun had been wiped down. Caro and Xavier both had gunshot residue on their right hands, but only swabs of Caro's hands showed blood. At some point in the night, Xavier rinsed his hands without using soap.

In the master bedroom, investigators found bullet fragments or evidence of bullet fragments on the floor, on the bed, in the wall above the bed, and in the ceiling. A forensic scientist opined that the wall and ceiling damage was consistent with the gun being held to the side of Caro's head, and fired in

an upward direction. The doctor who performed surgery on Caro on the night of the shootings confirmed that the bullet had traveled "upward on the side of the defendant's head."

Investigators found two bloody handprints on the doorjamb between Joey's bedroom and the bathroom that matched Caro's hand, and blood above one of the handprints matched Joey's blood. Stains on the pajama shorts and T-shirt Caro was wearing tested positive for blood. DNA testing matched some of the stains to Joey, some to Christopher, and some to Caro. According to a forensic scientist, projected blood caused some of the stains on Caro's shorts. He opined that one of the stains on Caro's shorts contained Christopher's brain matter, and a piece of Joey's scalp may have caused one of the other stains. Two blood stains in the master bathroom contained Joey's blood, one of those stains had potential contributions from Christopher. Material under Caro's fingernails tested positive for blood and contained DNA from Caro, Joey, and Christopher.

Various blood stains were found on Xavier's sweatpants, shirt, and jacket. Blood stains on Xavier's sweatpants, G.C.'s socks, the carpet, and the stair railing matched Michael's DNA. Most were transfer stains, but drops of blood caused stains on Xavier's sandals and on the knee of his sweatpants.

Based on blood spatter patterns, Rod Englert, a crime scene reconstructionist, opined that Joey was facedown in bed when shot. He testified that Michael was face up when shot. Christopher, who was sleeping next to Michael, sat up and was shot twice, as the first shot failed to kill him immediately. The jury saw an animation depicting Englert's opinion on how the shootings of Michael and Christopher occurred. Englert

testified that the inner thigh of Caro's shorts showed a high velocity spatter — the kind associated with gunshots. Englert opined that the person wearing the shorts shot Christopher and he expressed confidence "beyond a reasonable degree of certainty." Englert found transfer stains and no evidence of blood from a gunshot on Xavier's jacket. Englert concluded that the person wearing the jacket was "not involved" in "a shooting." He concluded gunshot spatter did not cause the blood stains on Xavier's pants and sandals.

Two officers interviewed Xavier on November 23, 1999, at 5:30 a.m. at the family home. Xavier indicated Caro was taking Prozac, she had attention deficit disorder, had been drinking margaritas, and agreed with the officer that the alcohol and Prozac may have had a synergistic effect. At some point, he told officers he had prescribed the Prozac to Caro. Around 7:00 p.m., officers escorted Xavier into his closet and let him obtain some items before he went to a hotel, but the officers did not catalogue items Xavier took from the house.

The defense presented evidence that the white truck Xavier saw outside the gate while leaving the hospital had entered hospital grounds around 10:00 p.m., that Joey and Michael had died at 10:00 p.m. or later, and that it only took 30 minutes to drive home at night — implying Xavier had enough time to kill the children and shoot his wife before the 11:21 p.m. call to 911. Defense expert Herbert MacDonnell reviewed the forensic evidence. He examined the shorts Caro was wearing under a microscope and did not find any high velocity impact spatter or mist. He did find projected blood on the inner crotch but opined that it was not the result of the shootings because of the confined spread of the stains and the small amount of blood.

MacDonnell found transfer stains on Xavier's jacket, socks, and pants.

Dr. Frederick Lovell, a medical examiner, reviewed evidence concerning Caro's head wound. He testified that the gun was held tightly against Caro's head, at a right angle to the bone above Caro's ear. The gun would have been pointed "[v]ery slightly downward." When asked how Dr. Lovell would explain a bullet fragment found in the ceiling, he testified to previously saying that he did not know how it got there. He testified that it was "highly unlikely" that the gunshot wound was self-inflicted. It would have been difficult to hold the gun against the skull at the slightly downward angle. The bruises on Caro's arms were consistent with finger grab marks. A criminalist found hair in Caro and Xavier's master bedroom that looked like it had been pulled out, though some, maybe all, of the hair belonging to Caro came out by the force of the gunshot.

The defense presented a number of character witnesses. They testified that Caro was an admirable, friendly, nice person who loved her children. Caro's parents testified about their financial arrangements with Xavier and Caro. Juanita testified that, after the shootings, Xavier told her: "Wait til you hear the 911 call, Juanita. You're gonna blow your mind." Later, Xavier told Juanita, step by step, how Caro killed the boys.

Caro testified in her own defense. Caro was forthcoming with Xavier about expenditures while she served as office manager, and wrote checks to her parents for family trip expenses only after discussing them with Xavier. Caro was sad, but not angry, about being fired as office manager and losing control of the family finances in August 1999. Caro had no hard feelings toward her friend VanEssen, who replaced Caro as

office manager. Caro never talked to VanEssen about killing herself. Xavier prescribed Prozac to Caro in August 1999 and increased her dosage in September or October 1999. Caro also took diet pills.

Caro and Xavier were having marriage difficulties. In June 1999, Caro stayed at a hotel for three days to get away from the family. In August 1999, after Xavier fired Caro, he told Caro that they should separate. Later that month, Xavier told Caro that he was going to a divorce lawyer and discussed with Caro division of assets. Caro did not believe Xavier kept the appointment with the divorce lawyer, but later found notes from the meeting. Caro wanted to make the marriage work and was unaware of Xavier's affair.

Xavier had purchased Caro a firearm for home protection, as well as lessons for her to learn how to use the gun. Xavier never told Caro the combination to the gun safe and would get the gun out for her before he would go out of town. Caro would pop the safe open with the prong end of a hammer to put the gun back. Caro had not fired the gun since before Christopher was born and denied ever brandishing it at Xavier.

Caro had only partial memories of the day on which the shootings occurred. She remembered the fight she had with Xavier. She remembered Xavier saying he was leaving, and she thought he meant he was leaving for good, though Caro did not remember Xavier actually leaving to go to the office. Caro could not remember what she wore that night. But she would not have been wearing the shorts she was found in because they were maternity shorts that were too big for her. She had never seen the T-shirt she was found wearing. Her last memory of that night was standing in the master bedroom closet, looking at a

pitcher of margaritas. Caro had no memory of hurting her children. When she woke up she thought they had been in a car accident because she was injured, and Detective Wade said the boys were hurt. When she was told her boys were dead, she did not know how they died. Caro was sure she did not kill her children.

On November 5, 2001, the jury found Caro guilty of three counts of first degree murder, found the firearm enhancements true, and found true the multiple-murder special circumstance. On November 6, 2001, Caro withdrew her plea of not guilty by reason of insanity.

The penalty phase began on November 27, 2001. In aggravation, the prosecution presented evidence of prior acts that Caro allegedly committed. On June 30, 1992, Caro and another woman argued over a parking space. Caro ended up grabbing the other woman by the hair with both hands and pulling her head against the inside of the woman's half-open driver-side window. In August 1988, during an argument, Caro punched Xavier in the face and fractured her knuckle. In 1996 or 1997, Caro gave Xavier a black eye by hitting him, possibly with her hand or possibly by throwing a jewelry box. In the late 1990s, Caro threw a necklace box at Xavier and hit him in the eye, causing a retinal tear that required laser eye surgery. Caro threw a "C" battery at Xavier during an argument in the late 1990s that tore a hole in the screen door. During an argument sometime between 1997 and 1999, Caro threw a three-pound box of hot rollers at Xavier, which missed and broke the bathroom mirror. At another time in the late 1990s, Caro threw pizza, dishes, and silverware on the floor during an argument before approaching Xavier with a butter knife. Xavier stated that he did not hit Caro during these incidents. On cross-

examination, the defense elicited from Xavier occasions when he was physically violent with Caro, including one time when he punched Caro, causing her to fall "like a sack of potatoes."

Xavier narrated a family video showing scenes of the three boys who had been killed. Xavier testified about the boys and their character traits.

In mitigation, the defense presented evidence that Caro was a happy, obedient child. Her parents never used physical punishment. Caro played basketball and volleyball, was a cheerleader, and graduated from high school with a "C" average. Xavier was the second boyfriend Caro ever had. Caro's first boyfriend testified that she was never violent with him or anyone else. Extended family members described Caro as a good, patient mother. Caro's cousin, a pastor, and the Ventura County Jail chaplain, testified that Caro was a person of compassion, caring, and genuine Christian faith. Caro never admitted in her confidential sessions with the pastor and chaplain to killing her children. The children's teachers testified that Caro spent hours volunteering in her children's classrooms, and observed that she was a friendly, caring, and affectionate mother.

Caro had a blood-alcohol level of 0.138 percent on the night of the shootings. According to a defense toxicology expert, Caro would have been staggering, would have felt sedated, and would have been impaired in her ability to process information. Her blood tested positive for Prozac and Xanax. Caro suffered from depression at the time of the shootings. A forensic psychiatrist attributed the killings and suicide attempt mostly to Caro's depression. He believed Caro fell in the class of depressed and suicidal women who "primarily commit[] suicide" and kill their

children as "a secondary act" to "prevent something bad from happening to the children they love." A clinical neurologist testified that Caro suffered residual brain effects seven months after the shootings. He diagnosed Caro with chronic depression accompanied by mood congruent psychotic features, alcohol dependence, alcohol abuse, and a dependent personality. The neurologist believed Caro had amnesia resulting from her brain trauma and the combination of drugs she took. In the neurologist's view, Caro was incapable of appreciating the nature and consequences of her actions on the night of the shootings.

On December 10, 2001, following the penalty phase, the jury returned a verdict of death. On April 5, 2002, the trial court denied a motion for new trial and a motion to modify sentence. The trial court sentenced Caro to death on each count of murder, with concurrent sentences of 25 years to life for the firearm enhancements.

## II.    DISCUSSION

### A. Jury Screening Issues

*i.    Caro's Presence for Stipulated Excusals of Jurors*

Caro contends she was entitled, as a matter of constitutional and statutory law, to be present when counsel for both sides discussed juror hardship in chambers and agreed by stipulation to excuse 62 potential jurors in an e-mail to the trial court. Jury screening in this case began on July 17, 2001. On that day, the trial court started introducing groups of prospective jurors to the facts of the case, soliciting applications for hardship excusals, and directing prospective jurors to fill out comprehensive juror questionnaires. The next day, the parties and the trial court discussed the prospect of stipulating to the

excusal of some jurors for cause. On July 23, 2001, the prosecution stated it had begun "informal discussions with the defense" about jurors "who both sides think will be challenged, likely successfully, for cause." Later that day, the trial court scheduled the parties to return on July 27, 2001, to address such stipulations. Defense counsel indicated she would exchange her list of potential "for cause" stipulations with the prosecution. On July 26, 2001, defense counsel sent an e-mail to the trial court identifying 62 prospective jurors both parties agreed the court could excuse "due to either hardship or cause." Fourteen of the excusals included the notation "(hardship)." The e-mail did not indicate specific reasons for the remaining 48 prospective jurors. On July 27, 2001, the trial court stated that the e-mail stipulation had been filed and placed in the record. Caro was present at the proceedings before and after the e-mail stipulation. We assume Caro was absent from the informal discussions and agreement on stipulations.

Caro argues she had the right to be present for these stipulation discussions and the stipulations. The federal Constitution provides a defendant the right to be present if "(1) the proceeding is critical to the outcome of the case, and (2) the defendant's presence would contribute to the fairness of the proceeding." (*People v. Kelly* (2007) 42 Cal.4th 763, 781-782.) A defendant's right to be present under the California Constitution and section 977, subdivision (b)(1) is similar. (*People v. Ervin* (2000) 22 Cal.4th 48, 74 (*Ervin*) [proceeding must have a "reasonable, substantial relation to [a defendant's] opportunity to defend the charges against him"]; *People v. Waidla* (2000) 22 Cal.4th 690, 742.) The burden is on a defendant to show that the " 'absence prejudiced his case or denied him a fair and impartial trial.' " (*Ervin*, at p. 74; *People*

*v. Virgil* (2011) 51 Cal.4th 1210, 1233-1234 (*Virgil*).) We reject general claims that a defendant might have provided useful input as "unduly speculative." (*Virgil*, at p. 1234; see also *People v. Benavides* (2005) 35 Cal.4th 69, 89 (*Benavides*).)

Caro fails to distinguish our prior decisions denying similar claims. In *Ervin*, the defendant challenged his absence from counsels' jury "screening" discussions about stipulating to the excusal of "prospective jurors whose questionnaires showed they were probably subject to challenge and excusal." (*Ervin, supra*, 22 Cal.4th at p. 72.) We found that the defendant's presence at such discussions "would have served little purpose." (*Id.* at p. 74.) The same is true here. Caro argues "she might have discouraged" the stipulated excusals. But even if such an argument could establish that Caro's presence was necessary, such a contention does not establish prejudice: It is "unduly speculative" because nothing in the record indicates Caro would have actually discouraged the stipulations. (*Virgil, supra*, 51 Cal.4th at p. 1234.)

Caro asks us to reconsider our precedent in light of the Washington Supreme Court's decision in *State v. Irby* (2011) 170 Wash.2d 874 [246 P.3d 796]. But in *Irby*, neither the parties nor their attorneys were present on the first day of jury screening, when the trial court administered juror questionnaires. (*Id.*, 246 P.3d at pp. 798-799.) During that first day, the trial court e-mailed the parties and suggested that reason existed to excuse certain jurors — some for cause. (*Ibid.*) The e-mail indicated that the trial court wanted to confirm the excusals that same day, and the parties agreed by e-mail to dismiss some of the suggested jurors within the hour. (*Ibid.*) *Irby* is distinguishable from this case. The trial court here did not rush an out-of-court for-cause jury excusal proceeding within an hour, nor did it

otherwise fail to provide a material opportunity for Caro to even see the prospective jurors. *Irby* thus gives us no occasion to reconsider our precedent in this case. We conclude the parties' stipulation to excuse jurors by e-mail did not violate Caro's right to be present or cause her prejudice.

### *ii.* *Stipulation To Excuse Prospective Jurors*

Caro asserts the trial court erred by accepting the parties' stipulated excusals, identified in defense counsel's July 26, 2001, e-mail, without further inquiry. She argues that the trial court should have determined whether each juror was properly excusable for cause. She contends the trial court's failure to make these determinations led to the improper excusal of qualified jurors and produced a biased jury.

We find Caro's challenge to the stipulation procedure forfeited and without merit. Although Caro attempts to characterize trial counsel's e-mail and subsequent conduct otherwise, we find it clear in the record that counsel stipulated to these excusals. Counsel then expressed no objection to the court's dismissing the listed prospective jurors based on the parties' agreement. These actions forfeited her challenges on appeal. (E.g., *People v. Duff* (2014) 58 Cal.4th 527 (*Duff*); *People v. Booker* (2011) 51 Cal.4th 141, 161 (*Booker*); see also *People v. Visciotti* (1992) 2 Cal.4th 1, 38; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1061 (*Mitcham*).)

Even if Caro's argument were not subject to forfeiture, we find it unpersuasive on the merits. As we have held time and again, trial courts commit neither constitutional nor statutory error when they permit counsel to prescreen juror questionnaires and stipulate to juror dismissals. (See, e.g., *Duff*, *supra*, 58 Cal.4th at p. 540; *Benavides*, *supra*, 35 Cal.4th at pp.

88-89; *Ervin, supra*, 22 Cal.4th at p. 73.) Stipulations benefit all parties "by screening out overzealous 'pro-death' as well as 'pro-life' venirepersons, and by substantially expediting the jury selection process." (*Ervin*, at p. 73.) Here, as in other cases where we have found no error, "once the preliminary screening process had concluded, the court and counsel then conducted the usual voir dire examination of the remaining prospective jurors in selecting the actual jurors who would serve on defendant's jury." (*Ibid.*) Caro fails to establish error on these facts or persuade us to overrule our prior precedent.

Finally, to the extent Caro complains that this procedure resulted in the improper excusal of jurors for cause, she is not entitled to relief. (See *People v. Potts* (2019) 6 Cal.5th 1012, 1052-1053 *(Potts)*; *Duff, supra*, 58 Cal.4th at p. 540; *Booker, supra*, 51 Cal.4th at p. 161; *Mitcham, supra*, 1 Cal.4th at p. 1061.)

### iii. Dismissal of Two Prospective Jurors for Cause

Caro argues the trial court improperly dismissed Prospective Jurors J.W. and D.S. for cause because of their views on the death penalty. Prospective jurors in a capital case who oppose the death penalty are not automatically disqualified "simply by virtue of their personal views on that punishment." (*People v. Fuiava* (2012) 53 Cal.4th 622, 656.) A trial court should only dismiss a prospective juror for cause if the juror's views would "prevent or substantially impair" that juror from carrying out their duty. (*People v. Lancaster* (2007) 41 Cal.4th 50, 78 (*Lancaster*).)

### a. Standard of Review

On appeal, we review the trial court's "for cause" juror excusals deferentially. If the juror's voir dire responses conflict

or are equivocal, we accept the trial court's findings if supported by substantial evidence. (E.g., *People v. Duenas* (2012) 55 Cal.4th 1, 10 (*Duenas*).)

Initially, Caro disputes this standard of review, asserting the trial court deserves no deference here because it misunderstood the applicable law. (Cf. *People v. Cunningham* (2015) 61 Cal.4th 609, 664 [de novo review appropriate where trial court applied incorrect standard in determining whether racial discrimination motivated prosecutor's peremptory strike].) At times, the trial court described the inquiry as concerning whether a juror could be "neutral" as between life imprisonment without parole or death. We agree with Caro that on their own, such statements could misleadingly suggest a juror cannot serve if he tends to disfavor the death penalty. Instead, "[t]he critical issue is whether a life-leaning prospective juror — that is, one generally (but not invariably) favoring life in prison instead of the death penalty as an appropriate punishment — can set aside his or her personal views about capital punishment and follow the law as the trial judge instructs." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1065 (*Thompson*).)

Nonetheless, we find that in context, the trial court's statements about neutrality were consistent with the proper inquiry: whether the prospective juror could "faithfully and impartially" follow the law (*Thompson*, *supra*, 1 Cal.5th at p. 1066; accord, *Lancaster*, *supra*, 41 Cal.4th at p. 78), and " 'conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate' " (*Thompson*, at p. 1064). In discussing whether J.W. could be "neutral," the trial court expressed doubt that J.W. could "reasonably consider both punishments" as instructed by the court. The court, too,

considered D.S.'s "ability to be neutral" to mean his ability to "give serious consideration to both potential punishments." When the court explained the purpose of voir dire to prospective jurors on several occasions, it conveyed — correctly — that it could only accept "jurors who will not vote automatically for or against the death penalty." The court also emphasized that jurors did not need "to choose between religious and ethical beliefs" and "the law," as long as they nonetheless "obey[ed] and follow[ed] the law." Moreover, we note the trial court did not excuse all jurors who had misgivings about the death penalty. In reviewing the sum of voir dire, we believe the trial court properly focused the inquiry on whether a juror could "weigh[] the aggravating and mitigating circumstances of the case and determin[e] whether death is the appropriate penalty under the law" (*People v. Stewart* (2004) 33 Cal.4th 425, 447), not just their personal views on the death penalty. Accordingly, we now turn to whether substantial evidence supported the excusals of J.W. and D.S.

### b. *Prospective Juror J.W.*

Prospective Juror J.W. stated in his questionnaire that he "strongly support[s]" the death penalty where "clearly warranted." He believed the death penalty was sought "[t]oo seldom." J.W. indicated that the death penalty should not automatically apply for the murder of children because it "depends on circumstances," though he "tend[s] to favor" the death penalty in such cases. Nonetheless, J.W. wrote that he "can't help but have [a] gut reaction against [application of the death penalty to women] — unless clearly warranted." J.W. wrote that his wife was "adamantly against" the death penalty. J.W. indicated that he would be able to listen to all the evidence and give honest consideration to both death and life, but also

wrote that "a conviction with death penalty could damage my marriage. My wife has deep convictions."

During voir dire, J.W. stated that his views had changed since filling out the questionnaire. He stated that "it's very unlikely I would vote for the death penalty in this case, but it's not impossible" because of "[p]ersonal concerns and just convictions." When defense counsel asked him to explain, J.W. stated, "I haven't changed my convictions regarding the death penalty per se. Knowing what I know about this case and just being honest, I think it would be difficult for me to apply it." J.W. stated that he did not have preconceived notions about the case, could conceive of a case where he would impose the death penalty, and stated he could be fair and impartial to both sides. But he indicated that his wife's opposition to the death penalty "might" affect him. J.W. told his wife that he might sit as a juror on a capital case but did not give her any other details about the case. When asked if he could set aside his wife's beliefs, J.W. stated, "I think so, but it's — it's a very difficult decision, and when there are personal ramifications, it's hard to guarantee." When pushed whether he could "forget about" his wife's opinions, he said, "Yes."

The prosecutor asked J.W. whether he could go with imposing the death penalty and then go home to his wife. J.W. responded, "The reason I mentioned what I did is I know it would be okay in the short-term, and the long-term effects on our relationship would be, in my opinion, unpredictable." J.W. said, "Yes," when asked whether the effects on his relationship were something he would worry about while acting as a juror. When asked whether that was "something that perhaps would impair your ability to impose death in a case that called for it," J.W. replied, "Perhaps." When asked if he could personally

impose the death penalty, J.W. said he easily could do so in a case like the Oklahoma City bombing, but followed up by saying, "I guess — I'm sorry.  Also old-fashioned.  The thought of imposing the death penalty on a woman is an effort."  When pushed on whether he could impose the death penalty on Caro after hearing about her background, he responded, "Theoretically, yes.  I said it wasn't impossible.  I do think the probability is low."  He stated that he could impose death in a case involving a triple murder if he "heard enough factors that led me to think it was the right thing to do."  He stated that he would balance the aggravating and mitigating factors and could "[c]ertainly" impose death based on a single overwhelming aggravating factor, "depend[ing] on [his] judgment."

The prosecution challenged J.W. for cause, and the trial court excused J.W. because of his statements that he was unlikely to impose death and his feelings about imposing death on women.  Based on J.W.'s responses, the trial court concluded J.W.'s "mind-set" would "substantially impair[] his ability" to "reasonably consider both punishments as a reasonable possibility in this case."  The trial court also relied on the fact that J.W. violated the court's admonition not to talk about the case by telling his wife that he might sit as a juror in a capital case.

Substantial evidence in the record supports J.W.'s excusal for cause.  J.W. said he would worry about potential damage to his relationship with his wife when acting as a juror and said that it "[p]erhaps" would impair his ability to "impose death in a case that called for it."  We disagree with Caro that *Wainwright v. Witt* (1985) 469 U.S. 412 requires the juror's own views, not those of a third party such as his wife, to prevent or substantially impair his performance.  This is an overly rigid

reading of *Witt*. The inquiry is whether "the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Id.* at p. 426.) On this record, J.W.'s marital concerns justified such an impression.

In addition, J.W. had a "gut reaction" against imposing the death penalty against a woman, a belief he stated in his questionnaire and repeated, unprompted, when asked whether he personally could impose death on a person. We acknowledge that J.W. gave statements indicating he would weigh the factors and impose death according to his judgment, but given the trial court's superior position to evaluate the juror's demeanor, tone of voice, and as the trial court put it here, his "mind-set," we do not "interfere with the trial court's resolution of" conflicting statements. (*Lancaster*, *supra*, 41 Cal.4th at p. 80; *People v. Cain* (1995) 10 Cal.4th 1, 60.) This is especially true because J.W. contrasted his ability to impose the death penalty in a case like the Oklahoma City bombing with this case — one involving a woman — where he only "[t]heoretically" could impose the death penalty.

Given the substantial evidence supporting the trial court's determination, we defer to its conclusion that J.W.'s statements amounted to substantial impairment.

### c. *Prospective Juror D.S.*

Prospective Juror D.S. stated in his questionnaire that the death penalty "should be used only in the most extreme cases[.] I do not believe that killing the defendant is a solution for the first killing, so I would strongly object to the death penalty unless overwhelmingly convinced of intent free of mental impairments." D.S. wrote that he supported life imprisonment

without the possibility of parole "over the death penalty." He indicated that he did not believe the death penalty serves any purpose. D.S. thought the death penalty was sought "[t]oo often" and "[r]andomly," and that it is applied to "[t]oo many minorities and women, few white men." When asked whether D.S.'s feelings about the death penalty were so strong that he would always vote against the death penalty, he placed a question mark in the "No" checkbox and wrote, "But almost always." D.S. similarly indicated he "would require sufficient evidence to convince me that the death penal[ty] will serve a purpose beyond retribution." When asked if he could listen to all the evidence and instructions and give honest consideration to both death and life imprisonment without parole, he placed a question mark in the "No" checkbox and wrote that he "would begin from the position that life without parole is enough punishment and no more is needed." However, D.S. saw no reason why he could not be a fair and impartial juror.

During the defense's voir dire, D.S. stated, "If I understand the proceeding correctly, I would have no objection to deciding guilt or innocence. But when we got to the next phase, I would have some very definite thoughts on it." When defense counsel asked whether D.S.'s thoughts would prevent him from keeping an open mind and considering all the evidence, D.S. replied, "I have some feelings that it seems to me might be in — in conflict with — I don't know with what . . . ." After another question, he continued, "The problem is probably, it seems to me, that the — the problem is that I believe that a killing is a killing is a killing, and to kill a second time for vengeance because the first killing occurred is ridiculous unless there is proof offered that — that it would protect society, and then of course I think society comes first. [¶] So I — it's a

complicated thing, and I would — I don't know exactly how to answer your question." In response to a later question, he reiterated that he would not impose the death penalty unless there was a threat to society. Nonetheless, D.S. responded "[s]ure" when asked whether he would weigh the evidence and could impose death if the aggravating circumstances outweighed the mitigating circumstances. But he indicated that he was "not sure what those two terms mean" and that he "might not understand it."

During the prosecution's voir dire, when asked whether D.S. could "ever impose death" in "this case," D.S. responded, "I have yet to hear anything." D.S. also noted there "[c]ertainly" existed a case where he would be able to impose death. D.S. indicated that his ability to vote for death in the case depended on the prosecution showing more than a "simple set of facts." The prosecutor then asked D.S. whether life in prison would accomplish the goal of protecting society from a threat. D.S. replied, "Aren't you saying that — in other words, you can't prove that it — that it's a threat to society, that the only thing you can prove is an actual murder and you want me to forecast what I would judge on what you may or may not prove? I can't do that." When pushed further on whether he could impose death on a person if life imprisonment without the possibility of parole would protect society, D.S. said, "Even — okay. That's a tough one. There would be — it would be very difficult. . . . Very difficult. I don't know exactly what the answer is. But I certainly will say it will be very difficult." D.S. said he did not "have an answer," whether there was any justification for the death penalty besides "protecting society." He said he could impose death on another human. When asked if he could impose death on a defendant knowing the other option was life

imprisonment without parole, D.S. said, "I can't answer that kind of question. That's too ethereal." When pushed further on this topic, D.S. responded, "I cannot say that absolutely I would never do it" and that "[i]t's possible. But I certainly have expressed hesitation."

The prosecutor challenged D.S. for cause. The trial court excused D.S. because of his hesitation to impose the death penalty and the limited society-protection rationale, which the court believed D.S. "unequivocally stated" would be "the only time" he would vote for death. Based on D.S.'s questionnaire and voir dire answers, the court "was left with the definite impression that the prospective juror would be unable to faithfully and impartially apply the law." The trial court specifically noted D.S. "hesitated" when faced with the possibility that life imprisonment without the possibility of parole would satisfy D.S.'s society-protection rationale.

After weighing the relevant information, the trial court determined that D.S.'s views substantially impaired his ability to set aside his personal beliefs and consider both sentencing options. Substantial evidence supports this conclusion. In his questionnaire, D.S. gave equivocal responses about his ability to vote for death. He believed he could be a fair and impartial juror, but also indicated that he would "almost always" impose life imprisonment without the possibility of parole. D.S. later wrote that it would be "very difficult" to impose the death penalty. These written answers certainly "are not magic phrases," and would not alone support the conclusion that he was substantially impaired. (*People v. Roldan* (2005) 35 Cal.4th 646, 697 (*Roldan*); see also *People v. Zaragoza* (2016) 1 Cal.5th 21, 41 [where questionnaire responses do not " 'clearly reveal' " an inability to perform the juror's duties, the trial court must

examine the juror in court to ascertain the juror's true state of mind]; see also *People v. Buenrostro* (2018) 6 Cal.5th 367, 415.) Here, however, substantial evidence supports the trial court's conclusion that D.S.'s questionnaire, combined with his repeatedly equivocal voir dire responses on whether he could consider both punishments, reflected that impairment. (See, e.g., *Duenas*, *supra*, 55 Cal.4th at p. 12 ["Comments that a prospective juror would have a 'hard time' or find it 'very difficult' to vote for death reflect 'a degree of equivocation' that, considered 'with the juror's . . . demeanor, can justify a trial court's conclusion . . . that the juror's views would " 'prevent or substantially impair the performance of his duties as a juror . . . ' " ' "]; *Roldan*, at p. 697.)

Caro argues that D.S.'s responses show the picture of a thoughtful person who had not prejudged the evidence. But D.S.'s thoughtfulness could be reasonably understood to indicate unsureness whether his beliefs would allow him to ever impose the death penalty in a particular case. (*Duenas*, *supra*, 55 Cal.4th at pp. 11-12 ["Many prospective jurors . . . ' "simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear' " ' "].) As the trial court noted, that equivocation became especially pronounced when the prosecution pointed out that life imprisonment without the possibility of parole might eliminate any potential threat to society.[3] (Cf. *People v. Rountree* (2013) 56 Cal.4th 823, 847

---

[3] D.S.'s statement that he would only consider the death penalty if the defendant is a danger "to society" is ambiguous as to whether he meant society outside of prison or inside prison as well — though at one point he acknowledged that he may be talking about "danger to the public." The jury can consider

[upholding juror excusal where answers could "hardly have been more equivocal"]; cf. *People v. McKinzie* (2012) 54 Cal.4th 1302, 1342 (*McKinzie*) [upholding for cause excusal of jurors who would only impose the death penalty in narrow circumstances not at issue in the case].)  In these circumstances, we defer to the trial court's determination that D.S. would have been substantially impaired in carrying out his duties in the penalty phase.

### iv.     Prosecution's Files on Prospective Jurors

Caro contends that the trial court should have required the prosecution to turn over its investigatory materials on prospective jurors.  The trial court agreed with the prosecution that such materials were undiscoverable work product.  In *People v. Murtishaw* (1981) 29 Cal.3d 733, we gave trial courts "discretionary authority to permit defense access to jury records and reports of investigations available to the prosecution." (*Id.* at p. 767.)  In June 1990, California voters approved Proposition 115, which added section 1054.6 to the Penal Code.  It provides that "[n]either the defendant nor the prosecuting attorney is required to disclose any materials or information which are [privileged] work product . . . ." (§ 1054.6.)  For purposes of section 1054.6's discovery bar, work product includes a writing "that reflects an attorney's impressions, conclusions, opinions,

_____

future dangerousness in prison (*People v. Medina* (1995) 11 Cal.4th 694, 766-767), but the prosecution cannot present expert testimony on that issue (*People v. Avila* (2006) 38 Cal.4th 491, 610).  Regardless, D.S.'s responses at the very least show that he was not sure whether dangerousness in prison would ever allow him to impose the death penalty.

or legal research or theories . . . ." (Code Civ. Proc., former § 2018, subd. (c), now § 2018.030, subd. (a); see Pen. Code, § 1054.6; *People v. Zamudio* (2008) 43 Cal.4th 327, 355 & fn. 14.) We need not decide whether the discovery request here solely sought work product or encompassed non-work-product material because any potential error was harmless. For any error of this type, it is " 'entirely speculative whether denial of access caused any significant harm to the defense.' "[4] (*People v. Pride* (1992) 3 Cal.4th 195, 227; accord, *Murtishaw*, at p. 767.) We deny Caro's claim on that basis.

## B. Issues at Trial

### i. *Clothing Seized from Emergency Room*

Caro argues the trial court erred by allowing the introduction of the clothing that Caro was found wearing the night of the shootings. In the alternative, Caro argues her trial counsel was constitutionally ineffective for not moving to suppress this evidence. On the night of the shootings, emergency medical personnel brought Caro from her home to the hospital emergency room on two different

---

[4] Nor has Caro persuaded us she is entitled to the limited remand procedure used to remedy error under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. In that context, a limited remand for the defendant to establish prejudice is appropriate because the reviewing court has already determined the defendant demonstrated "good cause" for the discovery requested below — including that the discovery is material to the litigation. (See *People v. Gaines* (2009) 46 Cal.4th 172, 179-181; *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 85 ["The information sought must . . . be 'requested with adequate specificity to preclude the possibility that defendant is engaging in a "fishing expedition." ' "].) Caro made no such showing here.

"backboards" — flat, firm boards used to safely transport injured patients. Deputy Jeffrey Miller arrived at the hospital after Caro. Miller found Caro's shirt, pajama shorts, and underwear — which looked as if medical personnel had cut them off of Caro's body — spread out on one of these backboards. Miller seized this clothing and gave it to a field evidence technician.

Caro argues that the trial court should have excluded the clothing-related evidence because Miller did not have a warrant. Caro concedes, however, that defense counsel never brought a suppression motion related to this evidence or objected to its introduction on these grounds. This claim is thus forfeited. (See *People v. Miranda* (1987) 44 Cal.3d 57, 80.)

In the alternative, Caro argues that her counsel at trial was ineffective for failing to bring a suppression motion. To establish ineffective assistance of counsel, Caro must show that her counsel's performance was deficient and that she suffered prejudice from the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) On direct appeal, if the record " 'sheds no light on why counsel acted or failed to act in the manner challenged,' " we must reject the claim " 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Wilson* (1992) 3 Cal.4th 926, 936.) Where a defendant claims ineffective assistance based on counsel's failure to litigate a Fourth Amendment claim, *Strickland* 's performance prong requires her to show that it was objectively unreasonable — "that is, contrary to prevailing professional norms" — to forgo the motion. (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 385 (*Kimmelman*); see also *People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*) [the defendant bears the burden of

showing counsel's performance " ' "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms" ' "].)  Examining the Fourth Amendment claim's merit has a role to play here.  For example, "[c]ounsel is not ineffective for failing to make frivolous or futile motions."  (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)  The prejudice prong of *Strickland* then requires the defendant to "prove that [the] Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." (*Kimmelman*, at p. 375; accord, *People v. Coddington* (2000) 23 Cal.4th 529, 652 (*Coddington*); *People v. Wharton* (1991) 53 Cal.3d 522, 576 (*Wharton*).)

Caro fails to establish that a motion to suppress the clothing would have been meritorious.  Under the plain view doctrine, an officer may seize an item without a warrant if (1) the officer was lawfully in a place where the object could be viewed; (2) the officer had a lawful right of access to the seized item; and (3) the item's evidentiary value was immediately apparent.  (See *Horton v. California* (1990) 496 U.S. 128, 136-137; *Payton v. New York* (1980) 445 U.S. 573, 586-587; *Arizona v. Hicks* (1987) 480 U.S. 321, 327; *People v. Bradford* (1997) 15 Cal.4th 1229, 1295; see also *U.S. v. Cellitti* (7th Cir. 2004) 387 F.3d 618, 623.)  The doctrine does not amount to a full exception to the warrant requirement, but merely allows a warrantless seizure where an officer lawfully views, and can lawfully access, contraband or incriminating evidence. (*Bradford*, at p. 1295; *Horton*, at p. 137, fn. 7 [holding that even if incriminating evidence is in plain view in a suspect's home, an officer cannot enter the home and seize the contraband without a warrant, absent exigent circumstances].)

In this situation, the incriminating nature of the clothing — covered in bloodstains after the shooting — was immediately apparent. Caro raises the possibility that because she had shot herself in the head, the stains could have been her own blood. Yet that possibility does not eliminate the strong likelihood that some of the stains would link her or some as-yet-unidentified assailant to her or her sons' injuries.

Given the clothes' evidentiary value, trial counsel would need to establish Officer Miller did not have lawful access to them in order to block their admission from trial. But the record is inconclusive on this point, as it fails to reveal where Miller was when he saw and seized the clothing from the board on which emergency personnel transported Caro. That ambiguity makes it quite difficult to assess the legality of Miller's actions viewing and seizing Caro's clothes. On this record, then, we cannot say the plain view doctrine was inapplicable, and Caro has not carried her burden to "establish that [her] Fourth Amendment claim ha[d] merit." (*Coddington*, *supra*, 23 Cal.4th at p. 652.)

### ii. Fifth Amendment Challenge to Caro's Hospital Room Statements

Caro argues that two statements she made to Detective Wade at the hospital should have been excluded from trial because (1) she did not receive the warnings required under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and (2) the statements were involuntary. The day after the shootings, Caro was moved to an intensive care unit (ICU) room after her surgery. In the afternoon, Wade arrived in plain clothes, and hospital personnel removed Caro's breathing tube. Wade began sitting with Caro and stayed with her, or near her room, for two and a half to three hours before providing Caro *Miranda*

warnings. Detective Rivera was also present in plain clothes. Wade recorded her conversation with Caro by placing a tape recorder on top of one of the machines near Caro's bed, or at times, on the bed itself. Wade spent much of the interview getting Caro ice chips, adjusting pillows, helping Caro sit up or change positions, and relating information to nurses, such as the fact that Caro wanted medication or that she was in pain. Intermittently with this care, however, Wade asked Caro what happened. Caro was in pain during much of the discussion with Wade, but the level of pain seemed to decrease when the nurse gave Caro a codeine injection. Before the nurse gave the injection, she asked if Wade was "getting much" from Caro and checked in with Wade to make sure she would not "mess up [Wade's] thing" by giving the injection. Wade responded that the nurse should do "what [the nurse] would normally do."

The two statements in dispute occurred at different times. At some point in the first hour and a half of questioning, before the codeine injection, Caro stated that she "might have fallen down the stairs," but also indicated that she did not remember. About 45 minutes after the codeine injection, Detective Wade heard Caro say she was bruised by "wrestling with a boy."

After the second statement, Detective Wade continued to ask Caro questions about what happened, but Caro indicated that she did not remember, and asked whether her boys and Xavier were there. Wade told Caro that her boys were hurt and asked if she knew how they were hurt. Caro asked if it was "something serious." Wade told Caro that she was investigating the death of Caro's boys, and that Caro was suspected of hurting them. Wade then gave Caro *Miranda* warnings, and Caro invoked her right to counsel.

In addition to Detectives Rivera and Wade, a psychologist hired by the district attorney, Susan Ashley, was present for much of the pre-*Miranda*-warning interview. After Caro said she might have fallen down the stairs, she noticed Dr. Ashley in the room, and asked who she was. Wade identified her as "Doctor Ashley" to Caro and may have mentioned she was a psychologist from the district attorney's office. Caro also noticed a man from the district attorney's office standing outside her door at one point, and Wade told her who he was. Caro asked why he was there and Wade told her he "was here because you got hurt. And we're trying to figure out what happened." After the first statement, but before the second, Caro asked a nurse why Wade was there, and the nurse responded, "I don't know. . . . I'm not involved with that."

The evidence showed that Detective Wade failed to give Caro *Miranda* warnings before the two statements at issue. Nonetheless, it also showed that she did not threaten or make promises to Caro. The trial court also found that Wade did not interfere with Caro's medical treatment and did not do "anything to overcome the will of" Caro. The trial court ruled that Caro was not in custody for purposes of *Miranda* during the Wade interview, and that Wade did not coerce an involuntary statement from Caro. Caro now challenges both rulings.

Before they begin custodial interrogation of a suspect, the police have an obligation to deliver *Miranda* warnings. This familiar admonition warns the suspect of the right to remain silent, that any statement may be used as evidence against him or her, and that the suspect has a right to the presence of a retained or appointed attorney. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1399-1400 (*Leonard*).) The warning is meant to protect the suspect's privilege against self-incrimination, which

is jeopardized by the inherently coercive nature of police custodial questioning. (*Miranda*, *supra*, 384 U.S. at pp. 478-479.)

The purpose of *Miranda* guides the meaning of the word "custody," which refers to circumstances "that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508-509.) Such a danger of coercion is usually present where there has been a " ' "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " (*People v. Stansbury* (1995) 9 Cal.4th 824, 830, quoting *California v. Beheler* (1983) 463 U.S. 1121, 1125; see also *People v. Moore* (2011) 51 Cal.4th 386, 394-395.) The key question is whether, under all of the objective circumstances, a reasonable person in the suspect's position would have felt free to terminate the interrogation. (*Leonard*, *supra*, 40 Cal.4th at p. 1400; *Howes*, at p. 509; *Thompson v. Keohane* (1995) 516 U.S. 99, 112.) But even if a person's freedom of movement has been curtailed, an "additional question" arises: "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (*Howes*, at p. 509; see also *id.* at p. 510 [discussing *Berkemer v. McCarty* (1984) 468 U.S. 420].) All objective circumstances of the interrogation are relevant to this inquiry, including the site of the interrogation, the length and form of questioning, and whether the officers have conveyed to the subject that their investigation has focused on him or her. (See *Stansbury*, at pp. 831-832.) This initial custody determination does not depend on "the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.) We have not explicitly discussed the custody analysis in a

medical setting, but a handful of courts have addressed the issue. (See *People v. Mosley* (1999) 73 Cal.App.4th 1081, 1091; *U.S. v. Martin* (9th Cir. 1985) 781 F.2d 671, 672-673; *U.S. v. Infante* (1st Cir. 2012) 701 F.3d 386, 397-398; *U.S. v. Robertson* (10th Cir. 1994) 19 F.3d 1318, 1320-1321; *U.S. v. Jamison* (4th Cir. 2007) 509 F.3d 623, 629-633; *U.S. v. New* (8th Cir. 2007) 491 F.3d 369, 374; *Wilson v. Coon* (8th Cir. 1987) 808 F.2d 688, 689-690; *Reinert v. Larkins* (3d Cir. 2004) 379 F.3d 76, 85-87.)

Statements taken in violation of *Miranda* are inadmissible in the government's case-in-chief. The prosecution may still use such statements for impeachment purposes. (E.g., *People v. Pokovich* (2006) 39 Cal.4th 1240, 1247; *People v. Peevy* (1998) 17 Cal.4th 1184, 1193.) What the government may not use against a defendant for any purpose are any of her *involuntary* statements. We consider statements involuntary — and thus subject to exclusion under the Fifth and Fourteenth Amendments of the federal Constitution — if they are the product of "coercive police conduct." (*People v. Williams* (2010) 49 Cal.4th 405, 437.) We evaluate this question by looking to the totality of the circumstances to determine "whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion." (*Id.* at p. 436.) The presence of police coercion is a necessary, but not always sufficient, element. (*Ibid.*) We also consider other factors, such as the location of the interrogation, the interrogation's continuity, as well as the defendant's maturity, education, physical condition, and mental health. (*Ibid.*)

When Detective Wade delayed giving *Miranda* warnings to Caro, she tread on perilous ground. True, Caro was not directly restrained by officers or informed she was under arrest.

And she eventually received *Miranda* warnings — though only after two and a half hours of Wade's off-and-on questioning. Hospital staff moved freely in and out of her hospital room. Wade's urging one nurse to do "what [the nurse] would normally do" and the somewhat intermittent nature of Wade's presence and questioning as hospital personnel tended to Caro or Caro rested may well have indicated to a reasonable person that she could be left to herself, if desired. And yet certain exchanges between Wade and the staff, and between Wade and Caro herself, may have suggested to a reasonable person that the police exercised some authority over whether she could terminate the interview. Specifically, we note the constant presence of one or more law enforcement officers and the suggestion of two staff members that they would not, or could not, interfere with the interview. Caro was also isolated from friends and family.

Such circumstances heighten the risk of coercion. In *Mincey v. Arizona* (1978) 437 U.S. 385, the high court concluded a hospitalized suspect did not give voluntary statements after an officer engaged in "virtually continuous questioning" of a suspect who had requested to be left alone. (*Id.* at p. 401.) Because the officer persisted despite Mincey's being "weakened by pain and shock" and "barely conscious," and the "clear" indications "Mincey wanted *not* to answer" his questions (*id.* at p. 401), the court concluded Mincey's "will was simply overborne" (*id.* at pp. 401-402).

The record of the trial court's decision indicates it made a contrary finding here — that Wade did not do "anything to overcome" Caro's will or interfere with her medical treatment. Unlike the defendant in *Mincey*, Caro gave no clear indications prior to the challenged statements that she wished to end her

interaction with Wade. But unquestionably, Caro's situation here constrained her physical mobility: she was confined to her ICU bed with a broken foot and a drain in her head from brain surgery performed just hours before. She was fatigued and in significant pain. While a defendant's "compromised physical and psychological condition" alone will not render her statements involuntary (*People v. Panah* (2005) 35 Cal.4th 395, 471), that condition is relevant to the inquiry and presents an opportunity for abuse.

Whether the extent of Detective Wade's engagement was sufficient to violate Caro's constitutional rights is not a question we need to resolve. Even assuming the interview violated *Miranda* or the statements were involuntary, their admission was harmless beyond a reasonable doubt. The prosecution introduced the two statements to disprove the theory that Xavier inflicted the injuries. The prosecution also used these statements to argue that Caro remembered killing her children and was lying about her amnesia. But in retrospect, taking into account the full record of the proceedings, these statements did not have high value in the overall evidentiary calculus.

For completeness, the jury heard testimony on Caro's *other* statements to Detective Wade before and after indicating she could not remember what happened. This included Wade's testimony that earlier in their conversation, she asked Caro whether she had "take[n] a fall or something," and *Caro* asked *Wade* what had happened. In addition, both statements had plausible alternative explanations consistent with the defense's theory and Caro's purported lack of memory. Caro's statement that she "might" have fallen down the stairs did not foreclose the possibility that Xavier caused her falling down the stairs — the prosecution's theory that she fell down the stairs while

"running through that house quite angry" was entirely speculative. And the defense presented testimony that, in an enhanced version of the tape, Caro was saying, "You have to ask the boys" rather than "wrestling with a boy." There was also evidence in the record that Xavier had kicked Caro "on the legs" and in the "buttocks," presenting a potential alternative explanation for Caro's bruises. Given the potential to reconcile the challenged statements with Caro's stating she could not remember what happened, we think it unlikely the jury put much weight on them as proving Caro remembered the killings.

Had these statements been omitted, moreover, it would have been unlikely to affect consideration of the case's compelling forensic evidence. Expert testimony about the bloody clothes Caro was found wearing provided a wealth of incriminating information. Five blood stains on her shorts matched Christopher's DNA profile — Joey and Caro potentially contributed minor amounts of DNA to one of these stains each. One of these stains was yellow and appeared to be brain matter. Three other stains on Caro's shorts matched Joey's DNA. Some of the stains on the shorts appeared to come from projected blood. A prosecution witness testified that gunshot mist likely produced one of the stains that matched Christopher's blood. While a defense expert testified that it was a stain more consistent with a beating, the defense expert acknowledged that the only evidence of violence against the children in the case involved gunshots. The shirt Caro was found wearing had 29 blood stains — two matched Joey's DNA, with Christopher and Michael as possible minor contributors, a control sample taken for one stain matched Christopher, and 19 stains matched Caro's DNA profile.

Evidence gleaned from the house completed the evidentiary picture. Two bloody handprints matching Caro were on the door jamb in the bathroom between Joey's room and Michael and Christopher's room. Blood on the doorframe next to the hand prints tested positive for Joey's blood, with minor contributions from Christopher. Blood on the sink in the bathroom matched Joey's DNA, and one sample also had a potential minor contribution from Christopher.

Further circumstantial support came from expert testimony regarding Caro's own gunshot wound. Prosecution experts opined that the bullet damage found in the ceiling and in the wall above the bed was consistent with the gun being fired at an upward angle. The surgeon who operated on Caro testified that the bullet travelled upwards, and all of the bullet fragments were above the bullet hole in Caro's head.

In contrast, the evidentiary support for the defense's alternative theory, which identified Xavier as the shooter, was comparatively weak. It ultimately did not sway the jury to doubt Caro's guilt, and we are convinced excluding the challenged statements would not have made a difference. A defense expert opined that Caro did not shoot herself because the gun was held at an awkward, downward angle. But he did not have "the slightest idea" how a bullet fragment hit the ceiling. Prosecution and defense experts agreed that the blood stains on Xavier's sweatpants, shirt, and jacket were almost certainly transfer stains. There was one projected bloodstain on Xavier's sweatpants, matching Michael's DNA. But as one expert testified, it was unlikely any of the stains came from the type of high-velocity spatter typically associated with shooting someone at close range. This would not have supported a conclusion that Xavier shot Michael. Instead, it was consistent

with Xavier's testimony that he had tried to give CPR to Michael and was carrying G.C., whose socks had become soaked in Michael's blood. Moreover, tests found gunshot residue, but no blood, on swabs of Xavier's hands — though Xavier testified he rinsed them at some point in the night. On the other hand, a swab of Caro's right palm did show the presence of blood.

Finally, the evidence showed that Xavier did not have much time between when he arrived home and called 911. A vehicle similar to Xavier's Mercedes entered the parking area at 9:24 p.m. and left at 10:36 p.m. The surveillance tape captured no other Mercedes leaving during the relevant timeframe — making defense counsel's assertion that Xavier left earlier implausible. The evidence largely showed that it takes 40 to 46 minutes to drive from Xavier's office to the family home — only one witness, Caro herself, testified to a shorter time (30 minutes). And the 911 call was at 11:21 p.m. Based on the prosecution's evidence, Xavier would have only 5 minutes maximum between arriving home and calling 911. If the jury accepted Caro's self-serving estimated driving time, he still would have no more than 15 minutes. A reasonable jury would not have believed Xavier shot his wife and children, hid all the blood evidence that might link him to the crime, and staged blood evidence corroborating his testimony within that window. Even if the jury accepted the possibility of this unlikely sequence of events, it stood at odds with the forensic evidence.

In considering the picture that emerges from this evidence, we are persuaded beyond a reasonable doubt that the jury would not have reached a different result in this case had the court excluded the challenged statements.

iii. *Ineffective Assistance of Counsel for Failure To File a Fourth Amendment Pretrial Suppression Motion*

Caro argues her counsel was constitutionally ineffective for failing to bring a pretrial suppression motion based on the Fourth Amendment to the federal Constitution. Caro asserts that such a motion could have challenged the introduction of (1) Caro's bloody clothing; (2) the scrapings of Caro's hands and feet after bags were placed over her appendages to preserve evidence; (3) photographs of Caro during surgery; (4) bullet fragments removed from Caro's head; (5) statements Caro made in the surgery recovery room; and (6) statements Caro made in her ICU room.

While she was unconscious, Caro was transported from the crime scene to the hospital. There, Caro's clothes were cut off and left on the backboard used to transport her, where an officer recovered them. A surgeon removed bullet fragments from Caro's head. Detective Rivera and forensic criminologist Debra Schambra were in scrubs and present during the surgery. Pictures taken by Rivera, Schambra, and other officers were admitted into evidence. After the surgery, a nurse gave the bullet fragments to Rivera, who later gave them to Schambra. Before the surgery, hospital staff placed bags over Caro's hands and feet to preserve evidence, and in the recovery room, Schambra took fingernail scrapings and performed a gunshot residue test. Rivera testified to statements Caro made in the recovery room and her ICU room. Later, Detective Wade asked Caro a number of questions in her hospital room, and Dr. Ashley, a psychologist, listened to a portion of that questioning.

We have already addressed Caro's ineffective assistance of counsel claim arising from the failure to move to suppress Caro's

bloody clothing. In this part, however, we address a different set of issues implicated by Caro's arguments. The Fourth Amendment limits searches and seizures where a defendant has a reasonable expectation of privacy in the place searched or item seized. This encompasses the defendant's property and possessory interests (see *People v. Valdez* (2004) 32 Cal.4th 73, 122), but also any privacy expectation " 'that society is prepared to recognize as reasonable' " (*Carpenter v. United States* (2018) ___ U.S. ___ [138 S.Ct. 2206, 2213]). So we must examine what reasonable expectation of privacy Caro had in her physical person and in other areas of the hospital, such as the operating room, the recovery room, and her ICU room.

Caro's primary contention is that Detective Wade violated the Fourth Amendment by entering her ICU room and then making observations and hearing Caro's statements, both before and after the administration of *Miranda* warnings. (See *People v. Cook* (1985) 41 Cal.3d 373, 381 ["the police may not intrude into a hospital room" to see or hear the activities within "simply because hospital personnel routinely go in and out"].) Three statements were admitted from Wade's conversation with Caro: Caro indicated that she may have broken her foot by falling down the stairs; that she might have gotten hurt by "wrestling with a boy"; and after receiving *Miranda* warnings and invoking her right to a lawyer, Caro spontaneously asked about where G.C. was located (and not about the other children).

As we earlier concluded, the first two statements were harmless beyond a reasonable doubt. Any claim of ineffective assistance of counsel based on these statements necessarily fails for the same reason. (See, e.g., *Wharton, supra*, 53 Cal.3d at p. 576 [defendant must show prejudice to prevail on a claim of ineffective assistance of counsel].) We also conclude that

excluding the third statement, concerning G.C., would not produce a reasonable probability of a different result in light of the compelling forensic evidence and implausibility of the defense's alternative theory. Counsel's failure to have these statements excluded on Fourth Amendment grounds or otherwise did not prejudice Caro.

Caro also asserts pictures taken of her in the operating room and in the recovery room violated her Fourth Amendment rights. At least one state has held that a defendant has no reasonable expectation of privacy in an operating room because of "a patient's traditional surrender to his or her physician of the right to determine who may and may not be present during medical procedures." (*State v. Thompson* (Ct.App. 1998) 222 Wis.2d 179, 192 [585 N.W.2d 905].) But even though Caro may have had no dominion over the operating and recovery rooms, concerns about incursions on the privacy we maintain in our bodies are heightened during medical procedures. (See, e.g., *Sanders v. American Broadcasting Companies, Inc.* (1999) 20 Cal.4th 907, 917 [citing cases where pictures of a patient in a hospital constituted an actionable intrusion upon seclusion under tort law]. But see *Hernandez v. Hillsides, Inc.* (2009) 47 Cal.4th 272, 294, fn. 9 [indicating that state tort law privacy rights are not necessarily coextensive with the 4th Amend.].)

Nonetheless, we need not consider whether or in what circumstances the government's taking of surgical images may invade a defendant's privacy. Caro fails to adequately explain why the exclusion of these pictures would have, with a reasonable probability, altered the outcome of the case. Caro's bloodstained clothes, with the high-velocity spatter and the potential piece of scalp, also established Caro's presence around

her children when they were shot, and, in the testimony of the prosecution expert, that she pulled the trigger.

Caro similarly offers only cursory, unpersuasive arguments regarding any prejudice from the fingernail scraping and gunshot residue evidence police collected. To the extent those fingernail scrapings indeed showed the blood of Caro's children, there was other evidence that Caro came in contact with her children's blood.

Caro also points to Detective Rivera's presence in the recovery room and the ICU room. Rivera testified to Caro's demeanor when he asked her questions, and when her surgeon asked her questions. But Caro fails to prove prejudice: her nurse and surgeon testified to Caro's demeanor in these timeframes, so there is not a reasonable probability that the exclusion of Rivera's testimony on these issues would have affected the outcome of the case.

Finally, Caro argues that the recovery of bullet fragments from her head during surgery was an illegal seizure. The Fourth Amendment limits only governmental activity. (See, e.g., *United States v. Jacobsen* (1984) 466 U.S. 109, 113.) Thus, the removal of a bullet by medical personnel acting independently of law enforcement directives does not implicate the rights therein. A hospital nurse handed the bullets from Caro's head over to the police, and Caro fails to address whether the nurse was acting at the request of officers when doing so. (See *Massachusetts v. Storella* (1978) 6 Mass.App.Ct. 310, 315-316 [345 N.E.2d 348] [upholding finding that nurse was not a government agent in similar circumstances].) Nor does she explain why she retained a property interest or reasonable expectation of privacy in the fragments once removed. (See, e.g.,

*Commonwealth v. Johnson* (Pa. 1999) 727 A.2d 1089, 1098 [holding the defendant had no reasonable expectation of privacy with respect to a bullet removed from him during surgery].) And even if officers improperly seized the fragments, Caro fails to meaningfully address any resulting prejudice.

Caro argues that the evidence addressed here was cumulatively prejudicial. But for some she fails to show that the evidence should have been excluded, and she does not persuade us other allegedly excludable evidence was cumulatively prejudicial. Caro's *Strickland* claim must fail. (See *Kimmelman, supra,* 477 U.S. at p. 375.)

### iv. Denial of Request for Continuance

Caro argues the trial court abused its discretion and violated due process by failing to continue a hearing on a motion to strike evidence that Caro asked about G.C. At trial, on September 17, 2001, Detective Wade testified that Caro asked about where G.C. was located, but not the three children who had been killed. On the next day of trial, September 18, 2001, Caro moved to strike Wade's testimony about G.C., asserting the statement violated *Miranda* and her Fourth Amendment right to privacy. Caro's *Miranda* argument asserted that Wade elicited the statement about G.C. by interrogation after Caro invoked her right to counsel. The Fourth Amendment argument asserted that Wade's presence in the hospital room violated Caro's reasonable expectation of privacy.

The hearing on the motion spanned over three days. The hearing began on the afternoon of the next day, September 19, 2001. The prosecution called Detective Wade to testify. The defense's cross-examination of Wade went long, so the trial court continued the hearing to the following morning. The following

day, September 20, 2001, the defense cross-examined Wade for a short amount of time in the morning and in the afternoon. During the afternoon cross-examination, the trial court asked defense counsel for a time estimate on any further evidence in the hearing. Defense counsel indicated that she needed 20 additional minutes to cross-examine Wade, and 10 to 15 minutes to present the testimony of Nina Priebe, a social worker who worked at the hospital. Because of Ms. Priebe's limited availability, defense counsel requested — and the trial court allowed — the hearing to continue to the following morning rather than later that day. The trial court did so with some trepidation, given the potential unavailability of prosecution witnesses the following week.

The next morning, on September 21, 2001, Priebe testified that she was a social worker at the hospital, and worked in the ICU on the day Detective Wade questioned Caro. Priebe heard screaming from Caro's room (likely right after Wade told Caro that her children had died), but did not go in because a nurse, Debbie Anderson, had told her that "police had asked us not to comfort" Caro. The prosecution objected on hearsay grounds, and the trial court sustained the objection.

After Priebe's testimony, defense counsel stated that she wanted to call Nurse Anderson as a witness, but indicated that she had been unable to contact her, and wanted to consult with an investigator. Anderson had testified in the case previously as a prosecution witness. But defense counsel stated she had been unable to contact Anderson because the only contact information defense counsel had was Anderson's work phone number, and Anderson had not been to work the prior two days. The court denied the request because "[a]ll parties knew today was the day we were going to have the hearing"; defense counsel

"had ample opportunity to have [her] witnesses present[;] . . . [a]nd the Court ha[d] been I believe extremely generous in allowing time for this hearing and for other hearings that have been occurring at the — the last minute." Caro now argues the denial of a continuance was an abuse of the trial court's discretion and a violation of due process.

The decision to continue a hearing so a party can secure the presence of a witness is one within the trial court's discretion. (*People v. Roybal* (1998) 19 Cal.4th 481, 504.) A trial court does not abuse its discretion in denying a continuance unless the defendant establishes good cause for a continuance. (*Ibid.*) Good cause requires a defendant to show that he or she exercised due diligence in pursuing the witness's presence, the witness's expected testimony was material and not cumulative, the testimony could be obtained within a reasonable time, and the facts the witness would provide could not otherwise be proven. (*Ibid.*)

We conclude the trial court did not abuse its discretion. As the trial court observed, counsel for both parties knew that the final part of the hearing would occur on September 21, 2001, a schedule somewhat determined by prosecution witness availability. Defense counsel did not raise the possibility of calling Anderson until the last minute. And Priebe's testimony that Anderson said that police told Anderson hospital staff should not comfort Caro was clearly hearsay if offered for the truth of the fact that police made that statement to Anderson. So counsel could have predicted the need for Anderson's testimony. Defense counsel asserted that she had no way of contacting Anderson because she had not been at work for two days, but defense counsel failed to explain what steps she had taken to contact Anderson, when those efforts were made, and

whether Anderson could be found in a reasonable time. Defense counsel also failed to argue that Anderson was the sole witness who could establish a police policy against comforting Caro that night. So the trial court did not abuse its discretion by denying a continuance.

Moreover, the trial court denied the motion to strike because (1) the statement at issue was "spontaneous" rather than the result of an interrogation under *Miranda*, and (2) the court had no jurisdiction to hear the Fourth Amendment issue. Anderson's testimony that police told hospital staff not to "comfort" Caro would have been irrelevant to the resolution of these issues. The trial court also concluded the statement was spontaneous and "voluntarily [made] by" Caro. Caro contends that Anderson's proposed testimony that hospital staff were asked to refrain from comforting Caro is relevant to whether Caro's spontaneous statement uttered after the *Miranda* warning was involuntary. Although such proposed testimony may be relevant in principle, it does not support Caro's contention in this case because Caro's statement was still a spontaneous utterance, not the product of police coercion. (See *Colorado v. Connelly* (1986) 479 U.S. 157, 167.)

Nothing in the record shows that officers sought to limit Caro's medical care or access to an attorney, and at the time the statement was made, Detective Wade was actively trying to find Caro's mother so that she could come comfort Caro. Caro's further contention that the testimony may have justified reconsideration of the trial court's prior *Miranda* and voluntariness findings is purely speculative. If Anderson's testimony would have warranted such an action, counsel might have obtained a declaration from Anderson and moved for reconsideration of the court's prior *Miranda* ruling, but did not

do so. So the trial court did not abuse its discretion or violate any constitutional rights by failing to grant the continuance.

> v. *Exclusion of Evidence Assertedly Implicating Right to Present a Defense*

> a. *Records from Xavier's Therapist*

Caro argues that the trial court erred by refusing to review and order the disclosure of records from Xavier's visits to a therapist. Before trial, Caro subpoenaed records maintained by Xavier's therapist. The therapist moved to quash the subpoena, relying on the psychotherapist-patient privilege and the right to privacy. The therapist also argued that Caro did not have the right to pretrial in camera review of the records under *People v. Hammon* (1997) 15 Cal.4th 1117 (*Hammon*). Xavier supported the therapist's motion. Caro opposed the motion. After a hearing, the trial court found that the psychotherapist-patient privilege applied and that our decision in *Hammon* prevented pretrial disclosure of privileged information. The trial court also found that Caro failed to establish "good cause" because she had not shown a "reasonable likelihood that the documents in question contain information that is both material and favorable to the defense and that the same or comparable information is not obtainable from nonpriv[i]leged sources."

Before us, Caro argues she has a federal and California constitutional right to an in camera hearing to examine Xavier's psychotherapy records, based on her right to confront and cross-examine witnesses. Caro contends that our decision in *Hammon*, which rejected such an argument, was wrongly decided. In *Hammon*, we declined to provide a pretrial right to discovery under the confrontation clause, and instead found that any such right under the confrontation clause attaches at trial.

(*Hammon*, *supra*, 15 Cal.4th at pp. 1127-11288.) Although the advent of digitized, voluminous records may conceivably raise new and challenging issues in this context, we decline to reconsider *Hammon* on these facts, which involve psychotherapy records from the relatively short period of time from August 4, 1999, to November 22, 1999. Moreover, Caro does not argue that the lack of pretrial discovery prejudiced her ability to request psychotherapy records at trial, or somehow altered her trial strategy. Nor does Caro argue on appeal that any requests for psychotherapy records were improperly denied at trial. In addition, Caro's primary contention on appeal that the records might have shown that Xavier fired Caro to consummate his affair rather than to fix the office's finances is speculative at best. We cannot conclude that the trial court's ruling interfered with Caro's right to confrontation in this case.

### b.  *Admission of Child Autopsy Photos*

Caro argues that four admitted autopsy photos showing the victims' wounds were so gruesome and inflammatory that their admission was unduly prejudicial under Evidence Code section 352. The trial court has broad discretion over the admission of photographs that are alleged to include disturbing details. (*Roldan*, *supra*, 35 Cal.4th at p. 713; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 353-354.) We routinely uphold the admission of autopsy photos to establish the placement of a victim's wounds and clarify the testimony of prosecution witnesses. (See, e.g., *McKinzie*, *supra*, 54 Cal.4th at pp. 1351-1352.) The prosecution is not limited to proving its case "solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case." (*People v. Gurule* (2002) 28 Cal.4th 557, 624.)

The prosecution sought to introduce 14 autopsy photos. The trial court excluded four of these photos as unduly prejudicial and cumulative. It allowed the introduction of the remaining 10 photographs. Caro now challenges four of the 10 admitted photographs. People's exhibit 40A was a close-up picture of the gunshot wound to Joey's head, showing some tearing around the wound, which a prosecution witness used to opine that the gun was touching Joey's head when fired. Similarly, People's exhibit 42B was a close-up picture of the wound to Michael's head, which similarly was used by an expert to opine that Michael suffered a contact gunshot wound because of visible hemorrhaging and tearing around the wound. People's exhibit 44B showed a large, gaping torn injury in Christopher's head, which demonstrated the damage caused by two gunshot wounds. People's exhibit 44C was a closer view of the wound Christopher suffered, which a prosecution witness used to explain how the bullet entered and exited Christopher's skull.

Each of these photos served an evidentiary purpose by supporting the expert's explanation of how the shootings occurred. Although the cause of death was not disputed at trial, these photos provided valuable context for understanding how the expert reached her conclusions about the nature of the shootings. (See *Booker, supra,* 51 Cal.4th at p. 170 ["photographs of murder victims are relevant to help prove how the charged crime occurred"].) Photographic evidence that Joey and Michael were killed by contact gunshot wounds and that Christopher was shot twice tended to demonstrate premeditation, deliberation, and the intent to kill. Moreover, we cannot conclude that these photos were *unduly* prejudicial. Although these photos constituted graphic images of gunshot wounds, even showing the insides of the victims' heads in the

case of exhibits 42B and 44B, we do not believe they were " 'so gruesome as to have *impermissibly* swayed the jury.' " (*People v. Burney* (2009) 47 Cal.4th 203, 243, italics added.) The pictures were limited to the result of the gunshot wounds themselves. They included no gratuitous details, unlike the pictures at issue in cases where courts have found an abuse of discretion. (See, e.g., *People v. Marsh* (1985) 175 Cal.App.3d 987, 996 [finding prejudicial photos of a child's dangling bloody scalp with, in the background, the child's blood-spattered torso "with the ribcages rolled back to expose the bowels"].) On balance, we conclude that the trial court did not abuse its considerable discretion in finding that the prejudice arising from the photographs did not substantially outweigh their probative value.

### c. *Rulings on the Parties' Objections*

Caro argues that the trial court erred in sustaining multiple prosecution objections and overruling multiple defense objections at trial. We review evidentiary rulings, including ultimate rulings on whether evidence should be excluded as hearsay, for abuse of discretion. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131, 132.) When a hearsay exception requires foundational findings of fact, we review such findings for substantial evidence. (*Id.* at p. 132.)

First, Caro contends that the trial court erred by allowing Xavier to testify that Caro gave more money to her parents than was documented by the checks in evidence. A lay witness must have personal knowledge of the facts to which he or she testifies. (Evid. Code, § 702.) Xavier testified "those checks represent only a fraction of what was paid to [Caro's parents] over that period of time for their expenses." Caro contends the prosecution laid

insufficient foundation of Xavier's personal knowledge of how much Caro paid to her parents. But the prosecution established earlier that Xavier reviewed his corporate and personal finances in August 1999, which established a foundation for Xavier's personal knowledge. Thus, the trial court did not abuse its discretion.

Second, Caro argues that the trial court erred by not allowing defense counsel to cross-examine Xavier about the location where he had sex with Laura G., the woman with whom he was having an affair, after the shootings. After the trial began, Xavier told the prosecution that he had sex with Laura at the Marriott Hotel where Xavier stayed for two or three months. Laura told the police that she and Xavier had not had sex at the Marriott Hotel, but had continued their affair. At trial, Xavier denied having sex with Laura at a hotel — a statement inconsistent with his prior statement. The trial court excluded this evidence because it considered the continued affair — but not its precise location — relevant to the case. The trial court alternatively excluded the evidence because its probative value was substantially outweighed by "its undue influence, bias, and consumption of time" under Evidence Code section 352. The trial court has broad discretion to exclude impeachment evidence where the subject matter is "collateral" with "no logical bearing on any material, disputed issue." (*People v. Contreras* (2013) 58 Cal.4th 123, 152.) The location of a witness's affair may be relevant in some cases. But here, Caro sought to establish a potential motive for Xavier to kill his children by showing the continued affair. Caro did not argue below, and fails to argue on appeal, how the location would be relevant to anything except Xavier's inconsistency and credibility on that issue. Moreover, given its collateral nature,

the trial court did not abuse its discretion by alternatively excluding the evidence under section 352. This is especially true because other evidence was elicited from Xavier showing the relationship continued soon after the shootings: He testified that he kissed Laura and was still in love with her in December 1999 or January 2000. The precise location of the affair's continued consummation was a minor collateral issue. The trial court did not abuse its discretion.

Third, Caro argues that the trial court erred by allowing prosecution expert Edwin Jones to testify that the prosecution made Caro's underwear available to the defense. In *Coddington*, *supra*, 23 Cal.4th at page 606, we held the work product privilege is violated where the prosecution asks questions that "invit[e] the jury to infer that . . . other [defense] experts were not called because their testimony would not be favorable." Here, Jones was a prosecution forensic scientist who testified on defense cross-examination that he examined Caro's underwear on July 10, 2001. Defense counsel asked if that was the first time Jones had examined the underwear, and he replied that he examined it "on a date earlier than that when other examiners were looking at [it]," those other examiners being "Richard Fox or Herb MacDonnell. One of those two or both." On redirect, the prosecution asked, "[W]ho is Richard Fox?" and defense counsel objected to the question under *Coddington*. Though, defense counsel said she would not object to testimony that the prosecution made the underwear available to the defense. The trial court sustained the objection. The prosecution then asked Jones if he "provide[d] access to that particular item to defense experts?" He replied, "Yes," and defense counsel did not object. Defense counsel waived a claim challenging this question by saying she would not object to

testimony that the prosecution made the underwear available to the defense. To the extent the question that was asked exceeded the scope of the waiver, Caro forfeited any claim by failing to object. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1365.) Moreover, the testimony was admissible. (See *People v. Scott* (2011) 52 Cal.4th 452, 489.) The trial court did not abuse its discretion.

Fourth, Caro contends the trial court abused its discretion by not allowing a police officer to testify that Xavier told him that a psychotherapist advised Xavier to increase Caro's Prozac dosage. Defense counsel proffered this testimony to impeach Xavier's testimony on what he told police about Caro's Prozac and to show that Xavier was trying to convince the police that a professional agreed with the increased Prozac prescription. Earlier in the trial, defense counsel had asked Xavier, "Did you tell the police when you were interviewed initially that your psychologist had prescribed Prozac for Cora?"[5] Xavier responded, "I don't recall if I used those words when I spoke to the sheriff's department." When asked if he had discussed Prozac with the police, Xavier stated, "To the best of my recollection, I mentioned to [the police] that Cora had been started on Prozac by me." Xavier denied that he tried to intentionally mislead the police about who prescribed the Prozac to Caro.

The trial court held that the police officer could not testify to Xavier's statement to police that a psychotherapist had *advised* Xavier on prescribing Prozac to Caro. According to the trial court, this was not an inconsistent statement that fell

---

[5]    Trial witnesses at times referred to Caro by her nickname, "Cora."

within a hearsay exception. To the extent this testimony was proposed for purposes of showing Xavier's attempt to seem more credible to police, the trial court held that, on the record before the court, Caro had not established a statement that implied such an attempt. Indeed, defense counsel indicated that they had not yet "gotten to" that part of the transcript of the police interview.

We conclude any error was harmless. If the evidence was admitted for its truth, it would not have harmed — and may have bolstered — Xavier's credibility, as evidence that he received advice about Caro's Prozac. Moreover, the purported inconsistency in the statement would have been unlikely to alter the jury's evaluation of Xavier's credibility because defense counsel's question about what Xavier told police was general, and he added the caveat that he was responding to the "best of [his] recollection." This evidence also would not have provided much support to the defense theory that Xavier sought to manipulate the police. Xavier simultaneously told police that he was the one who actually prescribed the Prozac; the advice of a family therapist not allowed to prescribe Prozac herself would not have added much legitimacy to his decision. Therefore, there is no reasonable probability this evidence would have changed the trial's outcome.

Fifth, Caro argues that the trial court erred by excluding the defense's proposed question to Caro, during direct examination, about whether Xavier told her he had kept his appointment with a divorce lawyer. On defense objection, the trial court held that the question called for hearsay and the answer would not be relevant to Caro's proposed inconsistent statement hearsay exception theory. Some questions later, Caro testified to believing Xavier had not kept the appointment with

the divorce lawyer based on Xavier's statements to her. Caro argues on appeal that this was the nonhearsay purpose for which the excluded testimony should have been admitted. But since this fact was established by the later testimony, no possible prejudice arose from the prior ruling.

Sixth, Caro argues that the trial court erred by allowing Detective Wade to testify to what Juanita said about Caro's statements. In the hospital, Juanita asked Caro, "Why did you do this?" and then said a prayer over Caro. During the prayer, Caro said "My babies. My babies. I'm sorry. I'm sorry." The prosecution sought to introduce evidence of Juanita's later statement to Wade that recounted Caro saying that she was "sorry for what happened to my babies." Defense counsel objected that the testimony constituted Juanita's speculation about why Caro was sorry. The trial court disagreed and found that Juanita was not speculating, but rather was attributing the statement to Caro. In context, the trial court reasonably interpreted Juanita's statement as reporting what she thought Caro had said in response to her question asking why Caro did it. To the extent another interpretation was possible, we cannot conclude that the trial court abused its discretion by resolving this factual dispute in a reasonable manner. (See *People v. Thornton* (2007) 41 Cal.4th 391, 429 ["The court's ruling did not fall outside the bounds of reason"].)

Seventh, Caro argues that the trial court should have allowed her to introduce transcript excerpts containing statements Xavier made to Juanita after the shootings. In a conversation recorded by Deputy Anthony Tutino, Xavier told Juanita the following: "[Caro] shot them in the head. She wasn't messing around." Defense counsel argued that this statement was relevant inconsistent statement evidence

because Xavier had never specifically testified about observing where Joey was shot in his direct testimony. Defense counsel also contended that this statement showed that Xavier had greater knowledge about how the children died than he should have had based on his direct testimony. The trial court ultimately denied the motion as to these transcript excerpts. Even if the trial court erred by excluding this evidence, any such error was harmless. Deputy Tutino had earlier testified to this same statement during the prosecution's case, and defense counsel ultimately referenced it during jury argument. Admitting a transcript of Xavier's exact words in addition to Tutino's testimony would have been largely cumulative and unlikely to affect the outcome of the case.

### d. *Exclusion of Written Statement in Police Report*

Caro argues the trial court erred by excluding a statement in a police report. Deputy Tutino wrote — in a paragraph concerning statements Xavier made to Juanita in the garage the day after the shootings — that "[Caro] told Xavier that she had killed all the kids." The prosecution argued that admitting this statement would violate the rule against hearsay because it was an out-of-court statement to be admitted for the truth of the matter asserted. This statement implicates three potential hearsay statements: the first level is Caro's supposed statement to Xavier that she killed the children; the second is Xavier's assertion that Caro made the statement; and the third is Tutino's writing about what Xavier said.

Caro contends that the purpose for admitting the statements only implicated the third level of hearsay — the police report itself. Caro argues that the first two levels of hearsay could be avoided because the statement would not have

been admitted for the truth of Caro committing the murders, or for the truth of Caro telling Xavier she committed the murders. Instead, Caro argues that Xavier's statement would have shown Xavier's attempt to place blame on Caro and impeach his credibility. Regarding the police report, Caro argues that it fell within Evidence Code section 1237, which provides a hearsay exception for past recollections recorded. The trial court found that this exception did not apply.

The Attorney General does not defend the trial court's exclusion of the statement, but rather argues that any error was harmless. We agree any error was harmless for the limited purposes for which the statement would have been admitted. The statement's purpose was to impeach Xavier's testimony about what he said in the garage and to show that he was trying to lay blame on Caro. This statement that Tutino wrote down, but did not remember, and which was not on the tape recording of the conversation in the garage, had low evidentiary value. Juanita also never testified that Xavier made such a statement to her, and Xavier did not remember making the statement. The jury would be unlikely to find Xavier measurably less credible had this statement been admitted. Moreover, the theory that this statement showed Xavier's attempt to lay blame on Caro does not hold up under scrutiny. It is unclear why Xavier would tell Juanita — but not the police — that Caro admitted to the crime if he shot his family and was trying to blame Caro. So for the limited purposes for which the statement would have been admitted, we conclude that any error was harmless.

e. *Cumulative Error and Right To Present a Defense*

Caro argues the trial court's evidentiary errors are prejudicial when considered cumulatively, and also violated her

constitutional right to present a defense. To the extent we assumed error, but found harmlessness with respect to Caro's evidentiary arguments, we do not find that those errors are cumulatively prejudicial. Those assumed errors involved evidence that was so minor that it was unlikely to have affected the case, even in the cumulative, and did not affect Caro's right to present a defense. (See *People v. Samuels* (2005) 36 Cal.4th 96, 114 [" 'generally, violations of state evidentiary rules do not rise to the level of federal constitutional error' "].)

### vi. *Admission of Computer Animation*

Caro argues that the trial court abused its discretion by allowing the prosecution to show the jury a computer animation depicting the opinion of Rod Englert, a blood spatter expert, on how the shootings of Christopher and Michael occurred. We review a trial court's decision to admit demonstrative evidence for abuse of discretion. (*Duenas*, *supra*, 55 Cal.4th at p. 21.) Before trial, the prosecution moved to introduce the computer animation, and the defense opposed. The prosecution argued the animation was admissible as a visual depiction of Englert's expert opinion on what happened. Regarding prejudice, the prosecution asserted the animation would not show highly emotional details of the crime, such as the victims' facial expressions and Winnie the Pooh paraphernalia. At the trial court's request, the prosecution played and narrated the animation for the court. The trial court found the animation to be admissible demonstrative evidence to the extent it represented only the prosecution expert's proposed testimony. Because Englert could not confirm whether Christopher's eyes were open during the shootings, the trial court ordered the prosecution to show them closed in the animation. The trial court also required Englert to provide a declaration confirming

that the final version of the animation depicted his understanding of the evidence. The prosecution shared a copy of the final version of the animation with the defense.

The computer animation was presented to the jury in eight scenes during expert testimony by Englert, who spoke after each scene. The animation featured three-dimensional, mannequin-like recreations designed with relevant details, such as clothing and hair. Englert testified that the animation illustrated his opinion of how the shootings had to occur to produce the bloodstain patterns on the clothing that Caro was found wearing the night of the shootings. The court also delivered a cautionary instruction about the animation to the jury multiple times over the course of trial.[6]

---

[6]    One of these instructions read: "This is an animation based on an expert's opinion. [¶] The computer animation we have here is nothing more than that, an illustration of the expert's opinion. You are instructed to treat it no differently than you would any chart or diagram of the evidence. [¶] The animation is not intended to be a film of what actually occurred, nor is it an exact re-creation. Therefore, there may be facts that are not exactly accurate or not exactly as they occurred but may be reasonably close. [¶] It is important to keep in mind that an animated video is not an actual film of what occurred, nor is it intended to be an exact, detailed replication of every detail of every event or every movement. It is only an aid to giving you an overall view of the particular version of the events, based on particular viewpoints or particular interpretations of evidence made by an expert witness. [¶] . . . In determining what weight to give to any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts and materials upon which each opinion is based, and the reasons for each opinion. . . ."

We allow the admission of a computer animation as demonstrative evidence of expert testimony, but only if certain conditions are met. The animation must accurately depict an expert opinion, the expert opinion must fairly represent the evidence, the trial court must provide a proper limiting instruction, and the animation must be otherwise admissible under Evidence Code section 352. (See *Duenas*, *supra*, 55 Cal.4th at pp. 20-25.) Caro contends the computer animation here is inadmissible under section 352. We disagree.

Evidence Code section 352 provides that a court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Caro argues that unlike in *Duenas*, where the cause of death was in dispute, the animation here is only minimally probative because only identity was disputed at trial. But Caro forgets that the animation had more than minimal probative value on the issue of identity. The animation illustrated the expert's opinion that the blowback of blood from a gunshot to Christopher's head was consistent with the bloodstain patterns on Caro's, not Xavier's, clothes.

It is true that courts must be mindful of the powerful impact computer animations may have on jurors. The potential for such impact does not, however, create "an unjustified 'air of technical and scientific certainty'" if accompanied by proper limiting instructions. (*Duenas*, *supra*, 55 Cal.4th at p. 23.) The trial court gave such limiting instructions here. They informed the jury that the animation merely illustrated the expert's opinion, it did not exactly recreate the events on the night of the shootings, and it was the jury's role to evaluate the expert's

opinion and its factual basis. While Caro argues that these cautionary instructions were ambiguous as to the animation's purpose, the instructions were quite clear: They stated that the animation was an aid for understanding an expert's opinion.

Further, the content of the computer animation is not itself so graphic that prejudice arising from those details substantially outweighs the animation's probative value. The animation featured mannequin-like representations of Christopher and Michael, with some facial features, hair, and clothing. The animation showed each gunshot fired, and the pattern of blood distribution after the gunshots, which was necessary to depict Englert's testimony. It featured only one personal possession of the children, a doll on the side of the bed that Christopher's blood had dripped on. While a slow-motion visual depiction of two killings is indeed disturbing, the animation did not include highly emotional details, such as graphic images of the damage wrought by the bullet entry wounds, the children's facial expressions, or other superfluous elements to tug on the heartstrings of the jury. (See *People v. Hood* (1997) 53 Cal.App.4th 965, 972.)

Caro also argues the animation was prejudicial because it was cumulative of other evidence. But in *Duenas*, we rejected a similar argument because it "misapprehend[ed] the animation's role as demonstrative evidence. The animation was not offered as substantive evidence, but as a tool to aid the jury in understanding the substantive evidence." (*Duenas, supra,* 55 Cal.4th at p. 25.) Here, the animation is similarly not cumulative, as it is demonstrative evidence illustrating expert testimony — such demonstrative evidence provides noncumulative value over the testimony itself by encapsulating what may otherwise be a confusing series of events. Because

whatever prejudice arising from the computer animation did not substantially outweigh its probative value, we conclude the trial court did not abuse its discretion.

### *vii.  Prosecutorial Misconduct*

Caro argues that the prosecution committed misconduct by making certain statements in the closing arguments of the guilt and penalty phases of trial.  Under California law, to establish reversible prosecutorial misconduct a defendant must show that the prosecutor used " 'deceptive or reprehensible methods' " and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted.  (*People v. Riggs* (2008) 44 Cal.4th 248, 298 (*Riggs*).)  A prosecutor's misconduct violates the federal Constitution if the behavior is " 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' "  (*People v. Redd* (2010) 48 Cal.4th 691, 733 (*Redd*).)  To preserve a claim of prosecutorial misconduct for appeal, a defendant must object and request an admonition. (E.g., *id.* at p. 734; *People v. Hill* (1998) 17 Cal.4th 800, 820.)  An exception exists where the objection and request for admonition would have been "futile or ineffective."  (*Riggs*, at p. 298.)

### *a.  Guilt Phase Closing Argument*

Caro contends that the prosecutor committed five instances of misconduct during closing arguments of the guilt phase.  To establish misconduct, Caro must show " 'a reasonable likelihood the jury construed the remarks in an objectionable fashion.' "  (*Potts*, *supra*, 6 Cal.5th at p. 1036.)

First, Caro argues that the prosecutor improperly vouched for Xavier's truthfulness by asserting that he was "honest" and that he "testified truthfully."  But Caro failed to object to these

statements and request an admonition, so the claim is forfeited. (*Riggs*, *supra*, 44 Cal.4th at p. 298.) Moreover, any misconduct was harmless. The comments were brief, and several were "followed immediately by references to evidence bearing on witness credibility." (*People v. Sully* (1991) 53 Cal.3d 1195, 1236.) The substantial physical evidence against Caro also corroborated Xavier's version of events over hers. And both parties and the trial court's instructions repeatedly emphasized to the jury that witness credibility was solely theirs to decide. Under these circumstances, there is no reasonable probability that the prosecutor's comments affected the outcome.

Second, Caro argues that the prosecutor committed misconduct by describing Xavier as "stifl[ing] sobs" and "crumpl[ing] over in pain" during his testimony. The statement, she contends, was impermissible because these physical cues are not in the record. Because defense counsel did not object or request an admonition on this issue, the claim is forfeited. (*Redd*, *supra*, 48 Cal.4th at p. 746.) Moreover, there was no misconduct. The demeanor of a witness is "rarely reflected in the record" (*People v. Navarette* (2003) 30 Cal.4th 458, 516), but is a proper factor for the jury to consider when assessing the witness's credibility (*People v. Jackson* (1989) 49 Cal.3d 1170, 1205-1206; see also Evid. Code, § 780, subd. (a)).

Third, Caro contends that the prosecutor improperly expressed a personal opinion in closing argument. She said, "And Deputy Tutino heard [Xavier] say again and again, 'She killed my best friend. She killed my best friend.' [¶] You know that [Xavier] was talking about Joey. Like any father [Xavier] would want to believe that he loved all of his children equally." She then began to say, "I'm sure he did a great job making each child feel loved and feel — " when defense counsel objected on

the ground that the prosecutor was expressing a personal opinion, and the trial court sustained the objection.

The prosecutor then went on to argue the following: "But as difficult as it is to say, you can tell from the state of the evidence that [Xavier] had a special place for Joey. Joey was the one who made [Xavier] a father for the first time. Joey was the one who was most like a person. He was the oldest at the time. [¶] And when [Xavier] sat there in his family room saying, 'She killed my best friend,' he was talking about Joey. That's probably why he was the defendant's first target." Caro asserts this second statement, too, was the prosecutor's own opinion and not permissible argument on the evidence.

As to the first statement about making each child feel loved, counsel objected but did not request an admonishment. As to the second statement, Caro did not object. Both omissions forfeit any challenge to these statements. (*Riggs*, *supra*, 44 Cal.4th at p. 298.) And the alleged misconduct was, in any event, so minimal as to have no reasonable probability of affecting the outcome.

Fourth, Caro asserts that the prosecutor improperly relied on facts not in evidence by arguing that Sergeant Timothy Lorenzen was the lead investigator but was not called in the prosecution case because he only had a limited set of duties. Caro argues that this was an improper way to explain the reason why the prosecution did not call Lorenzen to testify, and that the actual reason was that he was impeachable for cheating on an exam. But Caro failed to object to the argument regarding Lorenzen at trial; so the claim is forfeited. (*Riggs*, *supra*, 44 Cal.4th at p. 298.) Plus, any error was harmless because the

reason for not calling Lorenzen was a tangential, minor issue that would not have affected the outcome of the case.

Fifth, Caro argues the prosecutor improperly insulted the role of the defense by arguing that the prosecution's burden was to "prove to 12 jurors beyond a reasonable doubt the truth of the allegations against a defendant," while all the defense had to do was "confuse one of you." The prosecutor went on to say, "That's the tactic that many defense attorneys employ. Confusion. Throw up smoke. Try and mislead jurors. And maybe, by chance, they'll get lucky and get one." The prosecutor later said, "I just ask that you not be the one that the defense is trying to target for confusion." Caro failed to object to this argument, so the claim is forfeited. (*Riggs, supra*, 44 Cal.4th at p. 298.) In any event, we do not forbid prosecutors from arguing that the defense case seeks to confuse the jury. (See *People* v. *Kennedy* (2005) 36 Cal.4th 595, 626.) And the prosecutor was permitted, as she did immediately after these statements, to "highlight the discrepancies between [defense] counsel's opening statement and the evidence." (*People v. Bemore* (2000) 22 Cal.4th 809, 847.) We find no misconduct under these circumstances.

### b. *Penalty Phase Closing Argument*

Caro contends — in a summary bullet-point list — that the prosecutor committed 15 instances of misconduct during the penalty phase closing argument. Given the summary nature of her contentions, Caro fails to assert precisely why the statements were misconduct or cite relevant authority. She also does not argue how these statements prejudiced her, except by asserting that all of the prosecutorial misconduct claims were cumulatively prejudicial. The failure to " 'offer any authority or argument in support of [her] claim[s]' " would justify us

67

"declin[ing] to address these contentions." (*People v. Foster* (2010) 50 Cal.4th 1301, 1352 (*Foster*).) Regardless, Caro concedes that defense counsel did not object to the following statements, thus forfeiting her claim: (1) the assertion that Christopher was trying to "get away from his killer" and was "fighting . . . for his life"; (2) the assertion that Christopher "saved [G.C.]'s life by making her shoot [Christopher] twice, using up the bullet that was probably meant for [G.C.]"; (3) the statement that "[a]ll murders are committed when people are going through bad times in their lives"; (4) descriptions in the penalty phase of Xavier's testimony as truthful or honest; and (5) statement's that the dead children "would have been successful" and "would have been wonderful." (*Riggs*, *supra*, 44 Cal.4th at p. 298.)

For the following statements, Caro objected but failed to request an admonition: (1) the prosecutor asked the jury to cry for the boys; (2) the prosecutor misstated the law by asserting that every factor in the penalty phase must be proven beyond a reasonable doubt (and the jury instructions later stated the correct standard); (3) the prosecutor stated that the defense had "chang[ed] [its] story" in the penalty phase; (4) the prosecution referred to a witness as a "bought-and-paid-for defense expert"; and (5) the prosecution argued Caro was not someone who "wound up selling dope at age twelve to put food in her mouth, getting hooked on drugs." That failure forfeits her claims. (*Duff*, *supra*, 58 Cal.4th at p. 567.) With regard to the final statement about getting "hooked on drugs," Caro points out that the prosecutor continued by arguing that Caro was not "a poor inner-city kid who never had a chance." But Caro failed to object or request an admonition as to that subsequent statement, forfeiting the claim. (*Riggs*, *supra*, 44 Cal.4th at p. 298.)

Moreover, any potential misconduct in these statements was ultimately harmless.

Caro also raises a number of claims where the trial court overruled objections or rejected requests for admonitions. First, Caro contends that the prosecutor relied on facts not in evidence when she argued, "This defendant's situation is really not that much different from other people who are facing difficult relationships or failed marriages. [¶] In fact, hers was a lot better." The prosecutor continued, "The only real emotional disturbance or strain that separates this defendant from any other woman or any man who's facing a failing marriage is her vanity. Her pride. . . ." Caro objected, and the trial court overruled the objection. We find no misconduct. These references to how other women react to similar circumstances draws on " 'common knowledge' " or " 'common experiences.' " (*People v. Mendoza* (2016) 62 Cal.4th 856, 908.)

Second, the prosecutor incorrectly argued to the jury that appellant's toxicology screen did not test positive for Xanax. The trial court overruled a defense objection. But no possible prejudice arose from this statement because the prosecutor subsequently admitted its mistake to the jury, and the parties stipulated to the presence of Xanax in Caro's bloodstream.

Third, the prosecutor argued that the trial court could consider sympathy for Caro in mitigation, but not sympathy for her family. Defense counsel objected on the ground that this was a misstatement of law, and the trial court overruled Caro's objection. The prosecutor did not misstate the law. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 456 (*Ochoa*); see also *People v. Rices* (2017) 4 Cal.5th 49, 87-89.) Caro's citation to *Cullen v. Pinholster* (2011) 563 U.S. 170 is unavailing because it was an

ineffective assistance of counsel case based on a 1984 trial, before we held in *Ochoa* that the jury could not consider sympathy toward a defendant's family in mitigation. (*Pinholster,* at pp. 176, 191.) This argument was not misconduct.

Fourth, the prosecutor told the jurors to imagine themselves as Christopher in bed, feeling safe, before he was shot by Caro. Caro's objection was overruled. This argument was not misconduct. It is not improper for a prosecutor to "invite the jurors to put themselves in the place of the victims and imagine their suffering." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1212.)

Finally, the prosecutor stated that Caro "slaughtered" the boys. Caro failed to object, but later requested the jury be admonished that the term "slaughter" was improper. The trial court refused. This statement was not misconduct because the word "slaughter" is a fair description of what happened to the children — the killer shot three children in the head, in their beds, at point-blank range. The prosecutor is, to a point, allowed to use "colorful language to explain the prosecutor's view of the evidence." (*People v. Rundle* (2008) 43 Cal.4th 76, 163 (*Rundle*).) On the facts of this case, saying "slaughter" was not misconduct.

In addition, Caro contends that defense counsel's failure to object or request an admonition to the above statements constituted ineffective assistance of counsel under *Strickland.* But we regularly reject such claims on direct appeal where, as here, the record sheds no light on why defense counsel failed to object or request an admonition. (*People v. Gray* (2005) 37 Cal.4th 168, 207.) This is not the rare case where there "could be no satisfactory explanation" for the failure to object or request

admonitions, which may have arisen from a desire not to call attention to the allegedly faulty arguments. (*Ibid.*) The failure to object only rarely constitutes ineffective representation. (*Ibid.*) And Caro fails to demonstrate that the exclusion of the statements would have, with a reasonable probability, changed the outcome. We therefore reject Caro's ineffective assistance of counsel claim.

### *viii.    Penalty Phase Factor (b) Evidence*

Caro argues that there was insufficient evidence to allow admission of her prior criminal acts at the penalty phase of trial, and that the evidence presented was insufficiently specific to give Caro a fair opportunity to defend against the accusations concerning those acts. As a result, she contends that the evidence of prior acts violated her right to due process, to confront and cross-examine witnesses against her, and to a reliable determination of penalty under the Sixth, Eighth, and Fourteenth Amendments.

Section 190.3, factor (b) allows the jury to consider as aggravation evidence "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." To present such evidence at trial, the prosecution must provide the defendant notice of the evidence to be introduced and the opportunity to confront the available witnesses. (*People v. Yeoman* (2003) 31 Cal.4th 93, 136-137; see also *Rundle, supra,* 43 Cal.4th at p. 183.) Additionally, to consider this evidence in aggravation, the jury must be convinced beyond a reasonable doubt that Caro committed these prior acts. (*Yeoman,* at p. 137.) If these three requirements are satisfied, the jury may consider a defendant's prior criminal acts

without violating his or her rights to due process, a speedy trial, or a reliable penalty determination. (*Id.* at p. 136.) The remoteness of the prior criminal acts then affects their weight in aggravation rather than their admissibility. (*Id.* at p. 137.)

Caro first asserts that the notice given to her about the evidence to be presented, and the evidence eventually presented, deprived her of notice of the allegations and an opportunity to present a meaningful defense. For many of the seven prior acts presented in the penalty phase, the notice and testimony did not identify the specific timeframe when the event occurred. We rejected a similar claim in *Rundle* where the defendant argued that the section 190.3, factor (b) evidence relating to the defendant's ex-wife amounted merely to a "nonspecific series of acts occurring over a period of several months, without providing exact dates upon which specific acts of forcible sodomy or oral copulation occurred." (*Rundle*, *supra*, 43 Cal.4th at p. 182.) We held that the relevant inquiry is whether the three requirements set forth in *Yeoman* are satisfied. (See *Rundle,* at pp. 183-186 [requiring less notice of timeframes in penalty phase where the point is the evaluation of the defendant's character, not the establishment of a particular act].) Here, Caro had notice of the incidents at issue and evidence to be presented against her and had the opportunity to cross-examine witnesses. Moreover, defense counsel asserted the incidents would be "disputed and contested," the credibility of the witnesses would be "vigorously attacked," and "there are some very significant defenses to acts [the prosecution] claimed occurred." The jury was also instructed to only consider the evidence in aggravation if it found the prior acts true beyond a reasonable doubt. Our precedent does not require more. (See *ibid.*)

Caro also contends that there was insufficient evidence for the jury to conclude beyond a reasonable doubt that many of the incidents occurred because they were supported only by Xavier's uncorroborated testimony. We have previously rejected similar claims based on a witness's lack of trustworthiness in the section 190.3, factor (b) context. (*People v. Stitely* (2005) 35 Cal.4th 514, 564.) Rather than rendering factor (b) evidence inadmissible, the untrustworthiness of a witness's testimony goes to its weight and can be shown through cross-examination and other evidence. (*Rundle, supra,* 43 Cal.4th at pp. 184-185.) Neither the lack of specific dates nor the character of the evidence presented caused the evidence to be insufficient as a matter of law. (*Id.* at p. 185.)

Caro requests we require trial courts to hold hearings to determine whether the evidence is sufficient for a jury to find a prior violent offense beyond a reasonable doubt. Trial courts have discretion to hold such a hearing. (See *People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25; see also *People v. Friend* (2009) 47 Cal.4th 1, 87; *People v. Fauber* (1992) 2 Cal.4th 792, 849.) Caro argued here that a hearing was necessary because she planned to impeach the prosecution's evidence and present defenses. But the trial court did not abuse its discretion by finding the prosecution's proffered evidence sufficient without a hearing and allowing the jury to evaluate the defense response. And to the extent Caro argues that the probative value of the prior act evidence was not substantially outweighed by undue prejudice under Evidence Code section 352, that claim fails. The trial court did not abuse its discretion by finding that these prior acts were not "particularly prejudicial" in comparison to the offense of conviction, especially under the somewhat circumscribed Evidence Code section 352 analysis for Penal

Code section 190.3, factor (b) evidence.  (*People v. Box* (2000) 23 Cal.4th 1153, 1201.)

Finally, Caro asks us to reconsider *Rundle* because of the danger that jurors will credit vague, uncorroborated prior acts when introduced with more specific, corroborated prior acts. But we perceive no such danger where jurors receive instructions to only consider a prior act in aggravation if proven beyond a reasonable doubt.  Because the requirements in *Yeoman* and *Rundle* were satisfied, we reject Caro's section 190.3, factor (b) claim.

### C. Juror Misconduct and Related Motion for New Trial

#### i.  *Dismissal of Juror During Deliberations*

Caro argues that the trial court erred by dismissing Juror No. 9 for his statements to Juror No. 11 outside of the deliberation room.  In the alternative, Caro argues that if there was sufficient evidence for Juror No. 9's dismissal, then the trial court should have also dismissed Juror No. 11, who was part of the conversation with Juror No. 9.  Caro also contends that the trial court erred by failing to grant a new trial based on the jurors' posttrial declarations about their conversation.

On November 2, 2001, the jury foreperson submitted a note to the trial court stating that one of the jurors was a holdout who was refusing to deliberate.  Because this note came on a Friday, the trial court decided to excuse the jury and conduct an inquiry the following Monday.  But before excusing the jury, the trial court admonished the jury:  "I need to give you the admonition you've heard so many times before, but you need to hear it again.  [¶]  And that is you cannot discuss this case outside the presence of the jury room with the other 11 or 12

jurors. . . . You're not to deliberate upon the case any further during the weekend, and the only time you can discuss the case, deliberate the case is when you're back in the jury room Monday and all 12 jurors are present in the jury room."

The following Monday, the trial court called in the jury foreperson, who indicated that the juror at issue was no longer refusing to deliberate. The parties did not pursue the issue further. But defense counsel also raised a new issue discovered by a defense investigator, who saw Juror No. 9 and Juror No. 11 speaking in the parking lot the previous Friday evening after the jury was excused. Defense counsel requested an inquiry.

The trial court first examined Juror No. 9. When asked whether there was any discussion about the case between Juror No. 9 and Juror No. 11, Juror No. 9 said, "There was. There was one line, I think. One or two lines. That's correct." When the trial court asked Juror No. 9 to describe the discussion he related the following: "The comment which was discussed between myself and the one juror only . . . was in regards to the emotionalism of what was going on in the jury room and the fact that emotions were very highly charged. [¶] We were — there was some personal stuff said, which made it difficult for deliberations to take place, and there was also a comment in regards to the personal — or not personal, excuse me, in regards to the emotional state, which sounds really bad, but it was — in fact, the exact quote was in regards to the defendant. And it would have been 'she had to be emotional on that night.' And my response to that was that I agree." Juror No. 9 said that was the only discussion of the case. When asked whether Juror No. 9 or Juror No. 11 had initiated the conversation about the case, Juror No. 9 said, "It very well could be me, sir," but he could not remember. Juror No. 9 remembered telling Juror No. 11

regarding the deliberations that "it's not productive when people's tempers get so flared up they start to use personal attacks and stuff like that."

The trial court then called Juror No. 11. When asked whether the case was discussed in the parking lot, Juror No. 11 said, "Not specifically, no." When asked whether they spoke about the deliberations, Juror No. 11 said, "Sort of." Juror No. 11 explained, "Basically, he thanked me for taking the time to listen . . . and to understand his perspective of things." Juror No. 11 indicated this was the only discussion about the case and that she did not advocate for Juror No. 9 to do anything during the deliberations.

Defense counsel requested the discharge of Juror No. 9 because he "knowingly and willingly violated" the trial court's specific orders and "attempted to engage another juror in discussions about the emotional state of Mrs. Caro" in order to "convince her of his position . . . ." Defense counsel argued, "I want [Juror No. 9] off. He's deliberately and intentionally violated his oath as a juror. I just couldn't be more concerned about it." The prosecution agreed to the removal of Juror No. 9 so long as Caro personally consented to the discharge, and Caro consented. The trial court then discharged Juror No. 9, finding "good cause" because of his "flagrant violation of the court's order regarding discussing the matter outside the presence of the jury room with another juror and discussing subject matter that is indeed in the court's opinion deliberations on evidence received in this case."

The trial court then invited the parties "to raise any issues regarding Juror No. 11." The prosecutor raised concerns about removing Juror No. 9, but not Juror No. 11, if there was "two-

way participation" in the parking lot conversation. Defense counsel and the prosecutor agreed that they did not hear evidence that Juror No. 11 had made a comment about Caro's emotional state on the night of the shootings. Defense counsel also stated that Juror No. 11 seemingly did not understand that Juror No. 9 was attempting to gain support for his position, and that "she didn't offer any information about the case or discuss any of the facts of the case." The trial court agreed, and explained, "I took [Juror No. 11]'s comments to be it was [Juror No. 9] who was the initiator of the conversation and [Juror No. 11] was kind of stuck and being nice." The trial court stated it was not finding that Juror No. 11 discussed the case and noted that "no one is asking to excuse Juror No. 11. I presume if the parties felt there was something inappropriate in what she said, I would have heard it by now." After a recess, the trial court stated that it "was satisfied that nothing has occurred that would jeopardize [Juror No. 11]'s ability to continue to be a fair, impartial juror for both sides." The trial court asked the parties if they wanted to be heard, and neither defense counsel nor the prosecutor requested that Juror No. 11 be removed.

Following the penalty phase verdict, Caro filed a motion for new trial. Among other issues, Caro contended, through a declaration from Juror No. 9, that Juror No. 11 should have been removed for misconduct. Juror No. 9 declared that he and Juror No. 11 had "continued with the conversations that we had started in the deliberation room" as they walked to their cars, and that he did not remember who "initiated the topic of the deliberations or trial." Juror No. 9 wrote that he told Juror No. 11 that he "appreciated that she discussed the case calmly without flying into a tantrum as others had done" and that there was "mutual discussion revolving around the events that took

place that day." According to Juror No. 9, they went on to discuss Caro's state of mind. Juror No. 9 "made the point that Cora was of the opinion that her husband was going to leave her and the boys. He had done it before and he was just going to do it again. The e-mails and interviews showed this. . . . This might cause us to question the motive presented by the prosecution." According to Juror No. 9, Juror No. 11 said that this " 'was just the last straw for Cora,' " that Xavier was going to leave her again, and this time Caro could not stand it. Juror No. 11 then said "in a raised voice with some animation in the arms, 'Well [Juror No. 9], you know she had to be emotional that night.' "

The prosecution submitted a declaration from Juror No. 11. She stated, "On the evening of the fourth day of deliberations, [Juror No. 9] and I walked to our cars together in the parking lot. [Juror No. 9] brought up the topic of the deliberations. He made comments about how difficult deliberations were, and that the deliberations had gotten personal. He stated that the deliberations had become too emotional. I said something to the effect of, 'Well it had to be an emotional night, so it's understandable that we're emotional in there.' " Juror No. 11 also denied waving her arms when making this statement, referencing Caro's mental state on the night of the shootings, or discussing any of the evidence related to the case.

The trial court denied Caro's motion for new trial. It expressed general agreement with the prosecution's argument, which included an assertion that Juror No. 11's declaration, rather than Juror No. 9's declaration, accurately represented the events in the parking lot. The trial court then found that Juror No. 9's declaration did not differ substantially from the

statements uncovered in the inquiry at trial, and that Juror No. 11's declaration was consistent with what the court uncovered in the inquiry. The trial court noted that neither party requested Juror No. 11's discharge and that it was now "disingenuous" for the defense to assert that Juror No. 11 committed misconduct. The trial court also found that, if there was misconduct, it was not "inherently and substantially likely to have influenced" Juror No. 11, and it was not "substantially likely" that she was biased against Caro because of the conversation. The trial court later found that, in general, Juror No. 9 "infers motive or intent or conduct which a better factual analysis would not show that that was the import of that statement or the intent of the conduct or the motive of the person who made the statement." The trial court characterized this as, to some extent, a credibility finding with respect to Juror No. 9, who "just assumes things and perhaps believes them to be accurate when in fact a further analysis would reveal they're not accurate."

Regarding the dismissal of Juror No. 9, Caro has waived her claim of error. Defense counsel affirmatively sought to discharge Juror No. 9 because the juror committed intentional misconduct. She did not seek a mistrial based on Juror No. 9's discharge. Having forcefully argued for Juror No. 9's dismissal, Caro cannot now complain that the trial court erred in siding with her. (See *People v. Coffman* (2004) 34 Cal.4th 1, 49 [counsel invited error by affirmatively challenging juror]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1029 [claim of improper juror discharge waived where "defense counsel not only did not object to the substitution of the juror or move for a mistrial, but sought to have her excused"].)

Caro argues in the alternative that if the claim was forfeited, defense counsel's choice to seek Juror No. 9's removal constituted ineffective assistance of counsel. But Caro must show that her counsel's performance was deficient, that is, counsel's performance must fall " ' "below an objective standard of reasonableness [¶] . . . under prevailing professional norms." ' " (*Lopez*, *supra*, 42 Cal.4th at p. 966.) It is undisputed that Juror No. 9 committed misconduct. Without a more compelling argument, it is difficult to conclude a lawyer's attempt to remove a juror who clearly committed misconduct — an attempt to preserve the integrity of the jury — constitutes constitutionally deficient performance. Regardless, there may have been plausible strategic reasons for seeking Juror No. 9's removal that are not apparent on direct appeal. (*Ochoa*, *supra*, 19 Cal.4th at p. 445; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) So we cannot conclude that seeking to remove Juror No. 9 constituted deficient performance.

Caro next contends that even if the trial court was right to remove Juror No. 9, it should have also removed Juror No. 11 because she was equally culpable. To the extent Caro argues that the trial court should have removed Juror No. 11 during trial, defense counsel's failure to object or request a mistrial forfeited that argument. (See *People v. Williams* (2013) 58 Cal.4th 197, 289 (*Williams*); *Foster*, *supra*, 50 Cal.4th at pp. 1340-1341; *People v. Stanley* (2006) 39 Cal.4th 913, 950.) And to the extent Caro raises an ineffective assistance of counsel claim for not seeking Juror No. 11's dismissal, even assuming there was good cause for such a dismissal, the record is insufficient to evaluate trial counsel's tactical choice. (See *People v. Mendoza Tello*, *supra*, 15 Cal.4th at p. 266.)

Nonetheless, Caro brought a new trial motion arguing that a declaration of Juror No. 9 showed that Juror No. 11 committed misconduct. We only disturb a trial court's decision on a motion for new trial if the ruling constitutes "a manifest and unmistakable abuse of . . . discretion." (*People v. Thompson*, *supra*, 49 Cal.4th at p. 140.) If the motion is based on juror misconduct, we accept the trial court's factual findings and credibility determinations if supported by substantial evidence, but exercise "independent judgment" to determine whether the misconduct was prejudicial. (*People v. Dykes* (2009) 46 Cal.4th 731, 809 (*Dykes*).) Juror misconduct raises a presumption of prejudice. Still, we evaluate the entire record to determine if, on the whole, there was a " 'substantial likelihood' " of prejudice in the form of " 'actual[] bias[] against the defendant.' " (*In re Boyette* (2013) 56 Cal.4th 866, 890, italics omitted.)

As an initial matter, the trial court found that Juror No. 9's declaration did not substantially differ from the evidence at trial. Although some differences existed — Juror No. 9 asserted a longer, heated conversation than what he testified to at trial — the trial court's finding that there was no *substantial* difference makes sense in light of its credibility determinations about Juror No. 9. The trial court agreed generally with the prosecution's arguments on the motion for a new trial, which included an assertion that Juror No. 11's, rather than Juror No. 9's, declaration was accurate, and the trial court later found that Juror No. 9 lacked credibility. The trial court's findings implicitly rejected the additional details Juror No. 9 included in his declaration and showed acceptance of Juror No. 11's version of events, which comported with the evidence at trial. Caro argues that Juror No. 11's declaration differed from her trial

court statement, because she did not previously mention that she had told Juror No. 9 it had to be "an emotional night." But the declaration was consistent with Juror No. 9's statement at trial that he had "agreed" with Juror No. 11's assertion that " '[Caro] had to be emotional on that night.' " Although Juror No. 9's earlier account indicated that Juror No. 11 may have spoken about Caro's emotional state, and Juror No. 11's declaration contained a more general statement about an "emotional night," the trial court clearly felt that Juror No. 9 lacked credibility, so this minor difference does not make the later declaration inconsistent. We conclude the trial court's finding — that there was no substantial difference in the declarations' versions of events — was supported by substantial evidence.[7]

As a result, the trial court found that any juror misconduct was not inherently and substantially likely to have influenced Juror No. 11, and it was not substantially likely that she was biased against Caro because of the parking lot conversation. We find no abuse of discretion. The trial court found at trial that Juror No. 9 initiated a conversation with Juror No. 11 who "was kind of stuck and being nice." And the trial court implicitly

---

[7] The lack of credible new evidence alone may have been sufficient to deny the motion for new trial, given defense counsel's failure to object to, and her approval of, Juror No. 11's presence on the jury. (*Foster, supra,* 50 Cal.4th at p. 1341; cf. *People v. Cowan* (2010) 50 Cal.4th 401, 486; *Cowan v. Superior Court* (1996) 14 Cal.4th 367, 392; *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 103. But see *People v. Adame* (1973) 36 Cal.App.3d 402, 410.) Nonetheless, the trial court merely stated it was "disingenuous" to raise the new trial motion without new evidence and did not rule based on that fact. We do the same.

affirmed that finding by indicating that neither of the posttrial declarations altered its perception of what had happened. Juror No. 11's declaration thus supported the trial court's understanding of what occurred. The trial court's finding that Juror No. 11 was "kind of stuck and being nice" and the generalized, innocuous nature of her responsive statement to Juror No. 9 counters any implication that Juror No. 11 was actually biased against Caro. (See *In re Boyette*, *supra*, 56 Cal.4th at p. 889; *People v. Lewis* (2009) 46 Cal.4th 1255, 1309.)

Caro additionally contends that Juror No. 11 was actually biased because she did not disclose her statement that it had to be "an emotional night" at trial. But this precise theory of misconduct was never raised to the trial court, so is forfeited. (*Dykes*, *supra*, 46 Cal.4th at p. 808, fn. 22.) Moreover, Juror No. 11 did disclose that they had "[s]ort of" discussed deliberations, and that Juror No. 9 had thanked her for listening to him during deliberations. Omitting this mostly innocuous comment in response to the judge's question, "[D]id you discuss with him further about the deliberations?" may have been inadvertent and not misconduct. But to the extent it was misconduct, the trial court did not abuse its discretion by finding no actual bias — the omission was minor, and Juror No. 11 was candid in her declaration. (See *People v. Lewis*, *supra*, 46 Cal.4th at p. 1309.)

### ii. *Posttrial and Pre-sentencing Destruction of Dismissed Jurors' Notes*

Caro asserts that by destroying Juror No. 9's notes after his dismissal, the trial court deprived Caro of evidence supporting claims of juror misconduct in her motion for a new trial and violated Government Code former section 68152, subdivision (e)(1). After the conclusion of the penalty phase, on

February 1, 2002, Caro filed a motion for the release of Juror No. 9's notes as evidence of prejudicial jury misconduct. At the hearing on the motion, the trial court indicated that it had no such notes. The bailiff testified that when Juror No. 9 was excused for juror misconduct, the bailiff told him that he could pick up the notes at the close of trial. The notes were kept in the jury room in the meantime. After the trial, Juror No. 9 called the court twice and arranged times to pick up the notes but did not show up either time. The trial court judge was going to go on vacation for three weeks after these two dates, and the bailiff decided it would be best to destroy the notes rather than leave them in the courtroom. Because Juror No. 9 had failed to pick up the notes on the dates he said he would, the trial court agreed with the bailiff's suggestion. The bailiff destroyed Juror No. 9's notes (along with the notes for Alternate Juror No. 2 and Alternate Juror No. 5). The trial court's standard practice was to destroy juror notes after trial.

This practice did not violate any statutory or constitutional principles. Government Code former section 68152, subdivision (e)(1) required the trial court to preserve "court records" on a permanent basis. (See Stats. 1998, ch. 931, § 236, pp. 6523-6524; *id.*, ch. 932, § 34.5, p. 6816.) But the definition of "court records" found in Government Code former section 68151, subdivision (a) (Stats. 1996, ch. 1159, § 14, pp. 8475-8476) and former section 68152, subdivision (j) (Stats. 1998, ch. 931, § 236, pp. 6526-6527; *id.*, ch. 932, § 34.5, pp. 6817-6818) does not mention juror notes. Instead those provisions refer to official documents of the kind that would be filed with the court or an administrative agency, not a juror's informal notes on the trial. (See Gov. Code, former §§ 68151, subd. (a), 68152, subd. (j); see also *id.*, §§ 68151, subd. (a), 68152, subd. (g)

[similar current version of these provisions].) And even assuming "court records" can be construed to include juror notes and that such notes are discoverable, Caro has failed to demonstrate any prejudice. Caro's motion for new trial contained a declaration from Juror No. 9 and there is no evidence to indicate that Juror No. 9 was unable to remember his experiences during the trial. Accordingly, we deny Caro's claim regarding the destruction of Juror No. 9's notes.

### iii. *Exclusion of Defense Witness on Motion for New Trial*

Caro argues the trial court erred by not allowing the defense to call certain witnesses at a hearing on the new trial motion. The prosecution submitted declarations from all 12 jurors in its opposition to the defense's motion. Juror No. 9's declaration included the statement, "One day during deliberations, we asked the bailiff if we could see [a photograph of Xavier's car leaving his office's parking lot on the night of the shootings] projected on the wall and she stated that we could only have the evidence we already had back in the jury room." The alleged request was never communicated to the parties. In a morning hearing, the court reported that the bailiff had informed the court such a request never occurred. Defense counsel requested to examine the bailiff, who testified that such a request was never made. Defense counsel then asked to call Juror No. 3 — the jury foreperson — to testify to what occurred, based on defense counsel's "belie[f]" that Juror No. 3 would testify "that a conversation did take place with the bailiff regarding getting an additional item of evidence or an opportunity to view the photograph projected on the wall and that in fact a response was made." The prosecution argued that such testimony was irrelevant because Juror No. 9 was later

excused, causing deliberations to begin anew after the alleged request. The trial court observed that nothing in Juror No. 3's declaration indicated he would provide material testimony on this issue. Based on the evidence the parties had provided so far, the court tentatively found the alleged request did not occur. The trial court stated it would permit the defense to provide additional submissions but emphasized its intention to resolve the matter that day.

Later that day, defense counsel proffered written summaries of interviews with Juror No. 10 and Juror No. 9. The first allegedly stated that Juror No. 10 remembered Juror No. 9 making some sort of request to the bailiff. The second allegedly indicated that Juror No. 2 remembered Juror No. 9 asking for a photograph of Xavier's car and a note or sticker in the windshield of the car. Based on this proffer, defense counsel requested permission to file additional juror declarations, including the still-outstanding declaration anticipated from Juror No. 3, or, as an alternative, to call Jurors No. 9 and No. 10 to the stand. The prosecutor asserted the new information was not specific enough to support further hearing on the matter and renewed her argument that the issue was irrelevant. The trial court agreed and denied the defense's request to file additional declarations or call more witnesses. It faulted defense counsel for failing to timely submit any declarations after receiving permission to do so at the morning hearing.

Caro asserts the requested testimony would have shown that the bailiff violated section 1138 by failing to notify counsel of the alleged request. The government argues, and Caro does not dispute, that Caro did not raise this purported violation as a basis for her new trial motion. The trial court could not have

committed error by declining to take additional evidence on an issue irrelevant to the motion.

Even assuming Caro's motion incorporated the section 1138 claim and that it was a cognizable ground for obtaining a new trial, she fails to show prejudice entitling her to relief. (See *People v. Clair* (1992) 2 Cal.4th 629, 667 [trial court may grant new trial motion only if the defendant demonstrates reversible error]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1027 [" '[a] conviction will not be reversed for a violation of section 1138 unless prejudice is shown' "].) Suppose Caro's proffered juror testimony convinced the court that Juror No. 9 had indeed requested the enlarged photo. Her theory of prejudice is that Juror No. 9 believed the timestamped photo did not in fact show Xavier's car. Juror No. 9 therefore doubted the prosecutor's timeline establishing Xavier's whereabouts the night of the shootings. Had he been able to show other jurors a bigger image of the photo before the trial court discharged him for misconduct, at least one other juror might have shared his doubt about the timeline and the ultimate question of Caro's guilt. But Caro offers no more than speculation that the projected photo would confirm Juror No. 9's suspicions, that such confirmation had a reasonable likelihood of affecting jury deliberations after Juror No. 9's departure, or that the photo mattered to any remaining juror.

The trial court did not err in declining to hear additional witnesses on this matter.

## D. Other Issues

### i.  *California's Death Penalty Statute*

Caro raises a number of constitutional challenges to California's death penalty scheme that we have rejected on

multiple prior occasions. We are not persuaded to reconsider our precedent. (*People v. Winbush, supra*, 2 Cal.5th 402, 488.) We find no basis to conclude the state's death penalty scheme violates the federal Constitution by failing to: adequately narrow the class of offenders eligible for the death penalty (see, e.g., *id.* at p. 488); require written findings from the jury during the penalty phase (see, e.g., *id.* at p. 490); impose a standard of "beyond a reasonable doubt" on jury findings in the penalty phase (see, e.g., *id.* at p. 489; *People v. Case* (2018) 5 Cal.5th 1, 50); instruct the jury on any burden of proof in the penalty phase (see, e.g., *Winbush*, at p. 489); adequately narrow the aggravating circumstances the jury can consider (see, e.g., *ibid.*); require jurors to find aggravating factors unanimously (see, e.g., *id.* at pp. 489-490); inform the jury that the mitigating factors need not be found unanimously (see, e.g., *id.* at p. 490); place the burden of persuasion on the prosecution (see, e.g., *Williams, supra*, 58 Cal.4th at p. 294); instruct the jury on a presumption of life (see, e.g., *People v. Moore, supra*, 51 Cal.4th at pp. 415-416); inform the jury it could impose a life sentence even if aggravation outweighed mitigation (see, e.g., *People v. Page* (2008) 44 Cal.4th 1, 58); instruct the jury to impose a life sentence if mitigation outweighed aggravation (see, e.g., *id.* at p. 57); inform the jury not to consider the deterrent effect or cost of the death penalty (*People v. Elliott* (2012) 53 Cal.4th 535, 590-591); adequately narrow prosecutorial discretion as to who is charged with capital crimes (see, e.g., *People v. Weaver* (2001) 26 Cal.4th 876, 992); or require either "intercase proportionality review" or "the disparate sentence review that is afforded under the determinate sentence law" (*People v. Williams* (2016) 1 Cal.5th 1166, 1205). Nor did the trial court err by instructing the jury using adjectives such as "extreme" and "substantial" in

the list of mitigating factors (see, e.g., *People v. Boyce* (2014) 59 Cal.4th 672, 724), by instructing on inapplicable sentencing factors (see, e.g., *ibid.*), or by instructing the jury to impose death where "warrant[ed]" (*ibid.*).  The standard the jury uses to determine the penalty is not unconstitutionally vague.  (See, e.g., *ibid.*).  We have also repeatedly denied claims based on principles of equal protection (see, e.g., *Winbush*, at p. 490) and evolving standards of decency and international norms (see, e.g., *ibid.*).

### ii.  *Cumulative Error*

Caro contends that even if the asserted errors are harmless individually, they require reversal when considered cumulatively.  We assumed error on the claim that the prosecution should have provided its investigatory material about prospective jurors, as well as many of Caro's evidentiary and prosecutorial misconduct challenges.  But no subset of these potential errors, or their asserted cumulative effect, requires reversal.

### III.  CONCLUSION

We affirm the judgment.

CUÉLLAR, J.

**We Concur:**
**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**

PEOPLE v. SOCORRO CARO

S106274


Concurring Opinion by Justice Liu


Today's opinion declines to decide whether the admission of statements from Detective Cheryl Wade's interview of defendant Socorro Caro in the hospital on November 23, 1999, was unconstitutional and instead finds any error harmless. (Maj. opn., *ante*, at pp. 32–41.) Although I agree that admission of the statements was harmless, I see no reason to leave readers wondering whether a constitutional violation occurred here.

Detective Wade conducted a three-hour interview of Caro in the intensive care unit (ICU) a few hours after Caro had undergone emergency surgery for a gunshot wound to her head. Throughout the interview, Caro was bedridden, isolated from family and friends, in continuous pain, intermittently unconscious, under the influence of medication, encumbered by tubes, monitors, and intravenous lines, and suffering from a major foot fracture that had not yet been treated. Encountering Caro in this weakened state, Detective Wade sought to establish rapport by acting as Caro's caregiver and medical advocate, without revealing to Caro (until the end of the interview) that Caro was a murder suspect and that Wade was there to take recorded statements that could be used, and were used, against Caro in a capital trial.

I would hold that statements obtained under such circumstances are not "voluntary" — that is, they are not " ' "*the product of a rational intellect and a free will*" ' " — and their

1

admission for any purpose violates due process of law. (*Mincey v. Arizona* (1978) 437 U.S. 385, 398 (*Mincey*).) Moreover, Detective Wade gave no *Miranda* warning until the final minutes of the interview. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) Because no reasonable person in Caro's position would have felt " 'at liberty to terminate the interrogation and leave' " (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663 (*Yarborough*)), Caro's statements prior to the warning were also inadmissible under *Miranda.*

The police, responding to the murder of three children, understandably wanted answers. But the law provides safeguards against " 'interrogation techniques' " that, " 'as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned.' " (*Colorado v. Connelly* (1986) 479 U.S. 157, 163 (*Connelly*).) The hospital interview here crossed the line, and we should not hesitate to say so.

## I.

"A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' (*Mincey, supra,* 437 U.S. at p. 398.) The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time [s]he confessed.' " (*People v. Maury* (2003) 30 Cal.4th 342, 404 (*Maury*).) We ask " ' "whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' " In determining whether or not an accused's will was overborne, "an examination must be made of 'all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation.' " ' " (*Ibid.*) It is the

state's burden to show the voluntariness of the suspect's statements by a preponderance of the evidence. (*Connelly*, *supra*, 479 U.S. at pp. 168–169.)

The high court's decision in *Mincey* is instructive here. That case also involved a detective's hospital interview of a murder suspect. A few hours before the interview, at the murder scene, the police had "found Mincey lying on the floor, wounded and semiconscious." (*Mincey*, *supra*, 437 U.S. at p. 387.) At the hospital, Mincey received emergency treatment and was placed in the ICU. "He had sustained a wound in his hip, resulting in damage to the sciatic nerve and partial paralysis of his right leg. Tubes were inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting; a catheter was inserted into his bladder. He received various drugs, and a device was attached to his arm so that he could be fed intravenously." (*Id.* at p. 396.)

Evaluating these circumstances, the high court said: "It is hard to imagine a situation less conducive to the exercise of 'a rational intellect and a free will' than Mincey's. He had been seriously wounded just a few hours earlier, and had arrived at the hospital 'depressed almost to the point of coma,' according to his attending physician. Although he had received some treatment, his condition at the time of [Detective] Hust's interrogation was still sufficiently serious that he was in the intensive care unit. He complained to Hust that the pain in his leg was 'unbearable.' He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing

apparatus. He was, in short, 'at the complete mercy' of Detective Hust, unable to escape or resist the thrust of Hust's interrogation." (*Mincey, supra,* 437 U.S. at pp. 398–399, fns. omitted; see *id.* at pp. 401–402 ["Mincey was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, and his will was simply overborne."].)

The circumstances here are similar. Detective Wade interviewed Caro on the afternoon of November 23, 1999, less than 12 hours after Caro had undergone emergency neurosurgery for a life-threatening gunshot wound to the head. At 11:31 p.m. the previous night, police officers had found Caro lying unresponsive on the floor of her bedroom in a pool of blood and vomit, with a bullet wound to her head, following a 911 call by her husband. Paramedics transported Caro to the hospital by emergency airlift. At 2:30 a.m., a neurosurgeon performed emergency surgery to remove bullet and bone fragments embedded two centimeters into Caro's brain. The surgeon described the wound as "a large stellate explosion-type injury in the right parietal area where the scalp is literally blown apart, and there was no entrance or exit; it was a single large wound, and underneath it there was a compound depressed skull fracture which pushed the outer table of the bone into the brain." According to the surgeon, the procedure included excision of "[a]pproximately four by five centimeters" of skull as well as a "[m]inimal amount" of brain.

When Detective Wade arrived at Caro's hospital room between 12:40 p.m. and 1:00 p.m., Caro was lying intubated in the hospital's ICU with a drain in her head, a breathing tube down her throat, binders on her hands to prevent her from pulling out the drain, and multiple intravenous lines (IVs) in her body. She had received a codeine shot roughly 90 minutes

earlier and appeared to Detective Wade to be under the influence of medication.

In addition to the head injury, Caro had suffered a Lisfranc fracture in one of her feet that had not been treated at the time of the interview. As Caro's orthopedic surgeon described it, "the forepart of her foot, the part that begins at the top of the arch and continues out to the toes, was broken away from the middle part of the foot, the part that makes up the top of the arch." During the interview, Detective Wade observed that Caro's foot "[l]ooks pretty swollen."

A transcript and audio recording of the interview are part of the publicly accessible record in this case. (Cal. Rules of Court, rule 2.550(c).) At the start of the interview, medical personnel removed Caro's breathing tube and suctioned out the back of her mouth. Caro's distress during this procedure is evident from sounds of coughing, choking, and gasping on the audio recording of the interview. Throughout the three-hour interview, Caro was bedridden and required medical interventions. Hospital staff took an X-ray of Caro's foot, and a doctor examined the foot and told her she would need additional surgery after her brain injury had stabilized. Nurses placed a potassium IV in Caro's thumb, which caused a continual burning sensation; physically moved Caro in order to adjust her drain, causing significant pain; aided her in taking pain medication; administered a second codeine injection; and administered a blood draw. In addition to the drain in her head and the IVs, Caro at various points had an oxygen tube in her nose, an oxygenation monitor on her finger, an ice pack on her foot, compression stockings on her legs, and an ice pack on her arm to ease pain from the potassium IV.

Caro complained of severe pain continuously during the interview. At times, she was reduced to sobbing, moaning, or exclaiming, "It hurts, hurts, hurts, hurts, hurts" or "Ow, ow, ow." She expressed pain from the removal of the breathing tube and the removal of tape from her face. Three times, she complained of pain in her head. Twice, she indicated her throat was sore. Seven times, she reported serious pain in her neck and shoulders. Eleven times, she complained of severe pain from the potassium IV. Her broken foot was swollen and sore, and the doctor's physical examination of the foot caused her pain. At one point, Caro reported feeling pain "all over." Her back hurt. Her ears hurt. Her hands hurt. Her right arm and the inside of her thighs were bruised. She complained of discomfort from the oxygenation monitor on her finger, the compression stockings on her legs, the patches on her skin for monitoring vital signs, and the oxygen tube in her nose, which she tried to remove at least three times. In all, Caro expressed pain through words or moans at least 55 times during the interview.

Moreover, Caro drifted in and out of consciousness, especially after she received the second codeine injection. At times, her pain and fatigue reduced her to nonverbal communication. At one point, she told Detective Wade, "I'm doing my best so I can go to bed." A few minutes later, Caro appeared to fall asleep, prompting Detective Wade to ask, "Are you awake? Socorro? So we can talk to you? Are you awake so I can talk to you?" In her debilitated condition, Caro repeatedly expressed confusion and inability to recall what happened the previous night or why she was injured. In the middle of the interview, she could not remember Detective Wade's name. She exhibited no awareness that her children had been killed,

instead telling Detective Wade at one point that she believed they were at home with their grandmother. (At the penalty phase, a neuropsychologist gave unrebutted testimony that Caro suffered from continued amnesia about the events of that evening seven months later due to the combination of her brain injury and the alcohol and medication in her system when the events occurred.)

Thus, Caro was interrogated when she was "seriously . . . wounded" (*Mincey, supra,* 437 U.S. at p. 401), "weakened by pain" (*ibid.*), "on the edge of consciousness" (*ibid.*), and "evidently confused and unable to think clearly about either the events of [the previous night] or the circumstances of [her] interrogation" (*id.* at p. 398). Caro was also "isolated from family, friends, and legal counsel" throughout the interview. (*Id.* at p. 401.) In *Mincey,* the high court concluded that in light of Mincey's "debilitated and helpless condition" (*id.* at p. 399), "his will was simply overborne" (*id.* at pp. 401–402) by the detective's "virtually continuous questioning" for four hours despite Mincey's several requests to be let alone (*id.* at p. 401). Here, Detective Wade subjected Caro to repetitive and "virtually continuous questioning" for three hours (*ibid.*), and although the interrogation did not proceed in the face of a direct request to stop, an unmistakable element of "improper influence" is evident in the interaction. (*Maury, supra,* 30 Cal.4th at p. 404 ["A confession may be found involuntary if . . . secured by the exertion of improper influence."].)

Interrogation tactics that exploit a suspect's vulnerabilities may render statements involuntary. "[A]s interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness'

calculus." (*Connelly*, *supra*, 479 U.S. at p. 164.) One form of psychological pressure is a "false friend" technique in which the officer misleads the suspect into believing the officer is protecting her best interests. (*State v. Rettenberger* (Utah 1999) 984 P.2d 1009, 1016–1017.) Another is manipulation through misrepresentation of fundamental aspects of the interrogation. (*State v. Eskew* (Mont. 2017) 390 P.3d 129, 135–136.)

Throughout the interview here, Detective Wade presented herself to Caro as a supportive caregiver and advocate for Caro's medical needs and recovery. From the beginning, Detective Wade addressed Caro with terms of endearment ("Honey," "Hon") and spoke words of support and encouragement as Caro struggled with her physical condition (e.g., "You're doing great" "Just relax" "Feels good to take a breath, huh?" "You're doing terrific" "I know it hurts but you're doing great" "Everything's looking great"). In multiple interactions, Detective Wade assumed a caregiving role and projected a unity of interest with Caro. She reminded Caro not to pull out the drain in her head ("I know you know. . . . [I]t just makes me feel better to remind you."). She adjusted Caro's pillow and helped her roll over in the bed ("There you go. . . . Is that better?"). She repeatedly fed Caro ice chips ("Here you go, Hon. Open up. How's that? Is that better?"). She placed an ice pack on Caro's arm. She called a nurse to obtain medication when Caro requested it. She helped untangle Caro's medical wires. She even adjusted Caro's robe for her. And she repeatedly urged Caro to rely on her for any needs ("If you need anything just let me know, okay?" "You need something?" "Is that pillow bothering you?" "You want . . . another ice chip?" "Can I get you anything else?" "Do you need anything else?" "I'll just help you out, okay?" "Well, I know

you're not alright. I'm sorry to say that but if there's anything I can get you, you let me know, okay?").

At no point did Detective Wade give Caro privacy in medical treatment or in discussion with medical personnel about her condition. To the contrary, Detective Wade interposed herself between Caro and the hospital staff. She communicated with the medical team on Caro's behalf, alerting them to pain in Caro's shoulders and conveying Caro's answers to questions posed by the orthopedist. At various points, Detective Wade projected a measure of control over Caro's medical care. Hospital staff even conferred with Detective Wade before providing Caro with a codeine shot: A nurse told Detective Wade that she (the nurse) recognized Caro was "hurting and uncomfortable" and "would like to give her something for the pain," "but I don't want to mess up your thing." Wade eventually responded, "All right. If that's what you would normally do, then go ahead." The nurse noted that Caro was "just constantly" saying that "everywhere hurts" and that she (the nurse) had "been trying to put it off." After some discussion, Detective Wade said, "Right. Right. So go ahead."

On the surface, much of Detective Wade's interaction with Caro resembled the type of encouragement and comfort that a family member or friend would ordinarily provide to a fragile patient. In fact, however, Caro was isolated from her family and friends, and Detective Wade was not there to be Caro's friend. She was there to obtain recorded statements from a murder suspect and to elicit potentially incriminating information that could be used, and was used, to try the suspect for capital crimes. Notwithstanding her apparent solicitude for Caro's well-being, Detective Wade's interests were plainly adverse to Caro's.

Moreover, Detective Wade deliberately kept Caro in the dark about the fundamental context of the interrogation, i.e., that Caro's children were dead and Caro was a suspect. Only at the end — after hours of seemingly supportive and ingratiating talk — did Detective Wade reveal to Caro: "[R]ight now I'm conducting . . . an investigation into the death of your boys . . . ." and "Now, you're suspected of hurting your boys." Detective Wade then gave *Miranda* warnings, and Caro invoked her right to counsel. Upon grasping that her boys were dead, Caro let out a series of audible gasps and cries over the course of several minutes in a chilling denouement to the interrogation.

In sum, it does not take much for a police interrogation to overbear the will of a person in an intensive care unit who, as a result of a gunshot wound to the head and emergency neurosurgery, is experiencing severe pain and intermittently losing consciousness. By acting as Caro's caregiver and advocate while withholding the fundamental context of the interrogation, Detective Wade exerted improper influence over a gravely injured and weakened suspect. Caro did not directly ask to stop the interview (until the end), but she repeatedly said she was in pain and wanted to sleep. While allowing Caro to sleep at various points, Detective Wade "ceased the interrogation only during intervals when [Caro] lost consciousness or received medical treatment, and after each such interruption returned relentlessly to [her] task." (*Mincey, supra*, 437 U.S. at p. 401.) It is not plausible to describe submission to such interrogation by anyone in Caro's condition as "voluntary" in any meaningful sense of the word. (See *Connelly, supra*, 479 U.S. at p. 163 [voluntariness inquiry must examine " 'interrogation techniques . . . as applied to the unique characteristics of a particular suspect' "]; *Miller v. Fenton* (1985)

474 U.S. 104, 116 [voluntariness inquiry must examine "techniques for extracting the statements, as applied to *this* suspect"].) Although the trial court opined that Detective Wade did not do "anything to overcome" Caro's will, the voluntariness of a suspect's statement, "to the extent the interview is tape-recorded," is "subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1177.) I would hold that admission of Caro's statements for any purpose offends due process of law.

## II.

Caro's statements were also inadmissible during the prosecution's case-in-chief for a separate reason: They were obtained before Detective Wade informed Caro of her *Miranda* rights. (See *Missouri v. Seibert* (2004) 542 U.S. 600, 608 ["*Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of h[er] rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."].)

To determine whether an individual is in custody for *Miranda* purposes, we ask " 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " (*Yarborough*, *supra*, 541 U.S. at p. 663; see *Miranda*, *supra*, 384 U.S. at p. 444 ["By custodial interrogation, we mean questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."].) When urging the admissibility of statements obtained through police questioning without *Miranda* warnings,

it is the state's burden to establish that the suspect was not in custody.  (See *People v. Davis* (1967) 66 Cal.2d 175, 180–181.)

In this case, several factors would have caused a reasonable person in Caro's position to believe that law enforcement was in control of the interaction and that she was not free to terminate the interrogation and leave.  The interrogation occurred in a hospital ICU; Detective Wade's assertive presence in an intimate environment where visitation is typically reserved for family and friends is itself significant.  There is no evidence that she or other members of the Ventura County Sheriff's Department ever asked for Caro's permission to be present.  And as noted, Detective Wade did not step out or step aside, or offer to do so, when Caro was undergoing medical treatment or having conversations with hospital staff about her bodily condition and medical needs.  Even the hospital staff seemed to regard Detective Wade as having a measure of control over Caro's medical care, as indicated by the conversation in which a nurse told Detective Wade that she (the nurse) wanted to give Caro a codeine shot "but I don't want to mess up your thing."

In addition to Detective Wade, other law enforcement personnel were present.  Detective Jose Rivera of the sheriff's department had been stationed by Caro's bedside or outside her room from the time Caro emerged from surgery, and he stayed there throughout the interrogation.  A deputy district attorney also stood outside the glass door to Caro's room. At one point, Caro asked about him, and Wade responded, "He's with the DA's office."  A psychologist hired by the district attorney's office, Dr. Susan Ashley, was present as well.

Further, Caro was "isolated from family, friends, and legal counsel." (*Mincey*, *supra*, 437 U.S. at p. 401.) From the time she regained consciousness after neurosurgery, Caro's only interactions (besides speaking to Detective Wade and briefly to Detective Rivera) were with medical personnel, and even in those interactions, Detective Wade several times interposed herself as Caro's caregiver or advocate. (See *Miranda*, *supra*, 384 U.S. at p. 445 ["incommunicado interrogation of individuals in a police-dominated atmosphere" carries substantial risk of Fifth Amendment violation "without full warnings of constitutional rights"].)

The circumstances of the interview were entirely consistent with the nature of Detective Wade's assignment that day: Caro was suspected of murdering her children, and Detective Wade was at the hospital to find out from Caro what had happened. It is hard to imagine that law enforcement officers, less than 24 hours after a triple murder, would have allowed a key suspect to leave their presence, and the whole context of the interaction would have made clear to a reasonable person in Caro's position that she was not " 'at liberty to terminate the interrogation and leave.' " (*Yarborough*, *supra*, 541 U.S. at p. 663; cf. *U.S. v. Martin* (9th Cir. 1985) 781 F.2d 671, 673 ["If the police took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors, or some combination of these, law enforcement restraint amounting to custody could result."].) The only reason for delaying the *Miranda* warning appears to have been Detective Wade's determination to elicit statements from Caro before revealing to her that her children had died and that she was suspected of harming them.

The control exercised here by law enforcement in its interaction with a bedridden, isolated, and severely injured suspect underscores the involuntariness of any statements obtained. Simple, lawful alternatives were available. Caro was not going anywhere, and the police had appropriately sequestered her in the ICU. Detective Wade could have waited to interview her until her condition had stabilized and she was fully awake, alert, and not in serious pain. Further, Detective Wade could have provided Caro with *Miranda* warnings at the outset of an interview, as the law requires. The state has not advanced any argument based solely on the fact that a murder had been committed, nor could it. Just as there is no " 'murder scene exception' " to the Fourth Amendment — that is, a warrantless search "[i]s not constitutionally permissible simply because a homicide ha[s] recently occurred" — there is no homicide exception to the Fifth Amendment or to the guarantee of due process of law. (*See Mincey*, *supra*, 437 U.S. at p. 395.) Caro's statements were inadmissible, and I would so hold.

In all other respects, I join today's opinion.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Caro

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S106274
**Date Filed:** June 13, 2019

_____

**Court:** Superior
**County:** Ventura
**Judge:** Donald D. Coleman

_____

**Counsel:**

Tracy J. Dressner, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Lance E. Winters and Ronald S. Matthias, Assistant Attorneys General, Joseph P. Lee and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Tracy J. Dressner
2629 Foothill Boulevard, #324
La Crescenta, CA  91214
(818) 426-0080

Chung L. Mar
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6169